# Final Decision Notice and
# Finding of No Significant Impact for the
# Heber Wild Horse Territory Management Plan
# Environmental Assessment

USDA Forest Service
Black Mesa Ranger District
Apache-Sitgreaves National Forests
Coconino and Navajo Counties, Arizona

## Introduction

The Heber Wild Horse Territory (territory) is located in the Black Canyon area of the Black Mesa Ranger District, Apache-Sitgreaves National Forests (Forests) and consists of approximately 19,700 acres. The territory boundary was established and delineated in 1974 following an inventory conducted by the former Heber Ranger District (USDA Forest Service 1974) to address the mandates of the Wild Free-Roaming Horses and Burros Act of 1971 (the Act). The territory is approximately 2.5 to 3 miles wide by about 7 miles long, centered about 5 miles southwest of Heber-Overgaard, Arizona in Coconino and Navajo Counties. The designated boundary runs roughly in a north-easterly direction from its southern boundary on National Forest System Road 300 to the northern boundary, which is private land. The north-northeastern portion of the territory is bounded by the community of Heber-Overgaard, with houses, roads, and fences. The west-northwest flank of the territory is bound by the Highway 260 corridor fence. The southeast flank is an irregular boundary comprised of ridgelines, drainages, and section lines. The Mogollon Rim, with its steep canyons and ridges, lies to the south of the territory. The territory occurs within the Wild Horse Management Area (19,700 acres) and the Community-Forest Intermix Management Area (939 acres) of the 2015 Apache-Sitgreaves National Forests Land Management Plan (Apache-Sitgreaves LMP).

There is a need to establish a territory management plan which includes setting an appropriate management level (AML) and population management actions for the territory. An AML is required by the forest land management plan and guidance with applicable laws and regulations, including but not limited to 36 CFR Part 222, Subpart D. Establishing an AML would ensure wild and free-roaming horses reach and maintain the agency's goal of sustaining these animals in a thriving natural ecological balance within the established territory boundaries.

Therefore, the purpose of this project is to establish a range with lower and upper AMLs for the territory. Another purpose of this project is to identify population management actions to maintain a healthy horse herd while also maintaining a thriving natural ecological balance, as described in the Heber Wild Horse Territory Management Plan Final Environmental Assessment (EA)[1].

---

[1] The environmental assessment is available on the project website.

To maintain a healthy herd within a thriving natural ecological balance, an in-depth multi-tier analysis process (USDI Bureau of Land Management Handbook H-4700-1)[2] was conducted in accordance with 36 CFR 222.21(a)(4). Based on this analysis, the Forest Service found an AML of 50 to 104 horses based on the resources available within the territory to support an upper limit of 104 free-roaming horses. This range of horses will result in a thriving natural ecological balance and avoids deterioration of the range while still meeting management direction for other resources.

The Final EA provides more detail regarding the project purpose and need; and its consistency with law, regulation, and other direction.

## Decision

Based upon my review of alternatives, I have decided to select alternative 2, the proposed action, which will maintain the horse population associated with the territory in a thriving natural ecological balance with other uses and within the productive capacity of their habitat. This decision includes adopting the Heber Wild Horse Final Territory Management Plan (Territory Management Plan) based on the proposed action that includes standard operating procedures and an annual operating plan for implementation. Specifically, this decision and the Territory Management Plan will:

- Establish the AML of 50 to 104 horses.

- Allow for a determination of excess animals. The Forest Supervisor, the official with delegated authority under Forest Service Manual (FSM) 2200, will document this determination in a letter to the file.

- Allow for the removal of excess horses to reduce the horse population to the upper end of AML (104 horses), following the actions outlined in the Territory Management Plan.

- Adopt an adaptive management process, based on monitoring and thresholds, to managing horses within the AML range of 50 to 104 horses to achieve a thriving natural ecological balance.

- Both temporary and permanent infrastructure will be built to facilitate the management of horses.

- Implement design criteria to be used for resource protection measures.

- Establish the annual operating plan (AOP) as described in the Territory Management Plan. The AOP will document management actions (horse populations, herd health, or habitat management actions) that will be implemented that year, based on monitoring and adaptive management.

The proposed action has been used to create a Territory Management Plan for the territory. The Territory Management Plan will be in effect indefinitely unless conditions change that would warrant additional environmental analysis and development of an updated territory management plan. The Territory Management Plan is adaptive in nature and can be adjusted as necessary within the limits of this effects analysis.

The best available science was used in making the proposed decision. The project record demonstrates a thorough review of relevant scientific information, consideration of responsible opposing views, and where appropriate, acknowledgment of incomplete or unavailable information, scientific uncertainty, and risk.

---

[2] The USDI Bureau of Land Management Handbook H-4700-1 is considered the best available science and information (BASI) for determining an appropriate management level (AML).

## Appropriate Management Levels (AML)

This decision establishes the lower and upper limits of the AMLs for the territory at 50 to 104 horses based on an in-depth analysis of the resources available within the territory. The analysis is detailed in the *Proposed Appropriate Management Level Determination* document.

The AML determination uses the multi-tier analysis process identified by the Bureau of Land Management (USDI Bureau of Land Management Handbook H-4700-1). After determining the sufficiency of the territory to provide the four essential habitat components of water, forage, cover, and space, the second-tier analysis determines the amount of sustainable forage available for wild horse use, taking into consideration the management objectives of the area. This includes meeting land management plan standards and guidelines for upland vegetation and riparian plant communities, watershed function, and habitat quality for animal populations, including objectives necessary to protect and manage threatened, endangered, and Forest Service sensitive species. The second tier of the analysis included using half of the available forage to establish the high end of the AML. Utilizing one half of the available forage ensures there is still enough forage for the other grazing animals in the area. Tier 2 determined there is enough forage within the territory to support an upper limit of 104 free-roaming horses, while still meeting management direction for other resources. Tier 3 recommends periodic genetic analysis, and if the data show the herd is not maintaining genetic diversity, management actions would be taken.

## Strategy to Reach AML

This decision authorizes the Forest Supervisor or his/her delegate or agent to gather and remove any excess horses located across the Sitgreaves National Forest System lands, working furthest from the territory and progressively moving closer to the territory as outlined in Forest Service Manual (FSM) 2200. If all horses that reside across the Sitgreaves National Forest, are removed through gathers, and the population still exceeds the upper end of AML, horses would be removed from within the territory boundary until the population reaches 104 horses.

To ensure the safe and humane treatment of horses, gathers and handling will be conducted by authorized Forest Service personnel or authorized contractors using standard operating procedures in Bureau of Land Management IM-2015-151, Comprehensive Animal Welfare Program for Wild Horse and Burro Gathers. The standard operating procedures and requirements for bait trapping and helicopter gathers are outlined in the Territory Management Plan Appendix 1.

Gathering horses will typically be done via passive gather techniques such as but not limited to bait trapping. Horses may be lured into a trap site using bait (feed, mineral supplement, water) or sexual attractants (mares in heat). Traps can be located within or outside the territory in any location suitable to gather horses, in adherence to the project design features. Already disturbed areas such as existing livestock corrals, retrofitted for horses, will be used wherever possible. Where existing corrals are not available, a temporary trap site would be constructed. Helicopters may be used to assist during gathers if bait trapping is ineffective.

### Fertility Reduction

This decision also authorizes control of horse populations by treating with contraceptives. Population control techniques will be prioritized for use by the least invasive and least disruptive methods to horse bands and horse behavior. Horses closest to the territory will be treated first, moving progressively further from the territory until AML is reached. Contraceptives will continue to be used when needed based on monitoring within the adaptive management process.

Fertility reduction would be used to slow the rate of horse population growth and achieve the desired AML while allowing for genetic diversity. Some of the licensed fertility reduction control agents currently available for use include injectable agents such as various formulations of porcine zona pellucida (PZP), gonadotropin releasing hormone (also known as Gonacon), and other agents being developed such as growth and differentiation factor 9 (GDF-9) and bone morphogenetic factor 15 (BMP-15). Horses would be treated using an approved method including but not limited to bait trap, treat and release or using a darting method. Intrauterine devices such as the Y-shaped silicone intrauterine device for horses may be used in horses that are gathered but will be returned to the territory. For further information see the Territory Management Plan, Appendix 3.

*Gathers for Horses to Remain on or be Relocated to the Territory*

Handling corrals may be needed to temporarily hold and care for horses and implement management activities for horses that would remain on the territory. Management activities may include but are not limited to the following: administering fertility controls, vaccinations, or other health related needs; installing microchips or tracking collars; and collecting samples needed for genetic or other testing. Existing livestock corrals will be used that have been retrofitted to meet animal welfare standards, where possible. Two permanent handling corrals will be located within the territory. If needed, other temporary handling corrals less than an acre in size may occur within the territory or outside the territory on the Sitgreaves National Forest.

*Gathers and Removal for Excess Horses*

In accordance with the Act, gathered excess horses would be temporarily held in a permanently constructed holding facility to process horses for adoption, sale, or off-forest relocation. The preference is that gathered excess horses would be offered for adoption. They would be offered for sale if they are not adopted after three attempts at three different events or are over 10 years old. If not sold, they could be relocated to another territory or long-term facility. Lastly, in accordance with 222.69(c)(1), in the most humane manner possible, sick, lame, or old animals would be euthanized.

## Monitoring and Adaptive Management

Monitoring and adaptive management will be used to manage the horse herd once the population of horses has been reduced to the upper end of AML. By monitoring and assessing conditions of the land and horse herd, forest service managers will have the ability to adapt and make changes to their management practices to ensure a thriving natural ecological balance with other resources in this area.

The monitoring questions, thresholds, and management actions are found in the Final EA, Table 2. Each row lists indicators, monitoring questions, thresholds, and management actions that could be chosen. The Forest Supervisor in coordination with the Black Mesa Ranger District will have the option to choose which management action may be appropriate if a monitoring threshold is reached.

## Infrastructure

This project will require both permanent and temporary infrastructure needed to manage the horses.

A 61-acre area south of Highway 260 near mile marker 300 was analyzed for disturbance to build a permanently constructed holding facility. This area will contain both smaller and larger corrals for holding horses, a parking area large enough to hold many trucks and horse trailers, manure storage, hay barn, 2 camping pads with both water and electricity, a well, and other storage facilities as needed. The entire area was analyzed for disturbance so the facility could expand as needed based on horse populations and infrastructure needs associated with their management.

Two permanently constructed handling facilities will be located with the territory. Handling corrals will be used to administer contraceptives, vaccines, take blood samples, radio collar, or other activities which require the short-term handling of the horses. On the north side of the territory, a fence will be constructed along an existing roadway to connect with two already existing fences to create a large triangle of approximately 100 acres. Inside this area, 2 1-acre corrals and a water tank will be constructed. On the south side of the territory, a 1-acre corral would be constructed around two existing stock tanks (Zig Zag 1 and 2). Other temporary handling facilities (corrals) may be constructed as needed across the Sitgreaves National Forest as managers work to reduce horse populations with within AML. These sites will be temporary and built in previously disturbed sites when possible.

Traps will be used across the Sitgreaves National Forest, including inside the territory if needed, to gather horses.

A 10-foot-high fence will surround the 61-acre holding facility. Approximately 3 miles of barbwire fence will be built to encompass the handling facility on the northern end of the territory, adhering to fence design features that are wildlife friendly and to protect wildlife.

Additional water sources may be created based on monitoring and adaptive management.

All infrastructure improvements will adhere to project design criteria and the 2015 Apache-Sitgreaves LMP.

## Design Criteria

My decision includes design criteria for avoiding and minimizing impacts to Sitgreaves National Forest resources (see Table 3 of the Final EA**Error! Bookmark not defined.**).

## Annual Operating Plan (AOP)

Annual operating plans will outline the strategy for management for the year. The AOP will provide the specific activities necessary for management of the horses and the territory in accordance with the Territory Management Plan and the selected action. This will include items such as horse gather details, fertility management, infrastructure construction and maintenance, resource protection and improvements, and monitoring requirements and documentation.

## Unauthorized Livestock

On the Sitgreaves National Forest, horses not meeting the definition of wild horse as defined in 36 CFR 222.60(b)(13) would be considered unauthorized livestock and removed per 36 CFR 222.63 and state law, as applicable. This would occur in consultation with Arizona Department of Agriculture brand inspectors, tribal livestock inspectors, or conservation offers.

## Thriving Natural Ecological Balance

The Territory Management Plan includes actions that strive to meet a thriving natural ecological condition. A thriving natural ecological balance can be described as balancing wild horse management with other multiple uses, which assures appropriate progress is made toward meeting desired conditions, standards, and guidelines identified in the 2015 Apache-Sitgreaves LMP. This includes considering upland vegetation and riparian plant communities, watershed function, and habitat quality for animal populations. It also includes other site-specific or landscape-level objectives, such as those necessary to protect and manage threatened, endangered, and sensitive species. To help meet a thriving

natural ecological balance. This includes strategies to ensure forage, water, soil, vegetation, key habitats are in healthy condition and providing for the needs of the horses and other multiple uses.

## Decision Rationale

After examining the purpose and need and alternatives, I have decided to select the proposed action. My decision establishes an AML and population management actions outlined in the Territory Management Plan for the territory. My decision also allows for the management of the Heber horse herd in a way that is flexible, based on the results of monitoring, and that sustains the natural resources within, and surrounding, the project area. My decision also manages the territory and horse herd as a self-sustaining population of healthy animals in a thriving natural ecological balance with other uses and within the productive capacity of their habitat as required by Public Law 92-195, the Wild Free-Roaming Horses and Burros Act of 1971, as amended.

Based on the AML determination analysis, a population of 50 to 104 horses will ensure adequate forage and water supplies to support the herd on a year-long basis for the long term. Maintaining the horse population at this AML range will maintain the existing healthy rangeland vegetation plant communities within the territory. As well, managing the population within the AML would reduce the density of horses and thus reduce competition for resources, allowing horses to utilize preferred and quality habitat.

The modeling conducted as part of the project analysis predicts how long it would take to reach the AML; however, this is not an absolute prediction. Horse populations continue to grow; this along with factors such as funding and availability of individuals and groups to adopt horses will ultimately determine the time it takes to reach the AML.

The implementation of fertility control can result in improved longevity and lengthen generation time which is expected to slow the rate of genetic diversity loss. I believe implementation of the adaptive management monitoring plan, which includes monitoring the herd genetics and possible herd augmentation, will allow us to maintain genetic diversity objectives for this herd.

Finally, the decision includes design criteria to avoid or minimize potential negative environmental impacts, address comments and concerns raised by both the public and interdisciplinary team members during the development and analysis of the project and meet our multiple-use mission. By identifying necessary project design features and analyzing the environmental consequences of the proposed action and alternatives, potential impacts to cultural resources, horses, wildlife, rangeland resources and vegetation, water quality, soils, botanical resources, and social and economic resources were considered.

## Alternatives Considered

In making my decision, I considered seven additional alternatives besides the selected alternative. Six alternatives were considered and dismissed from detailed analysis. These alternatives include: 1) original proposed action, including sterilization of horses; 2) fencing Black Canyon Lake; 3) expanding the territory; 4) setting appropriate management level; 5) increasing the appropriate management level; and 6) reducing authorized livestock grazing to allow for a higher appropriate management level. These alternatives were not considered in detail based on analysis conducted and failure to meet the purpose and need for action. For more details on why each alternative was eliminated from detailed study, please see the alternatives considered but dismissed from detailed analysis section of the Final EA. As such, only two alternatives were considered in detail: the no-

action alternative and proposed action. The Final EA provides a comparison of the effects from each of the alternatives considered in detail.

## No Action

The no-action alternative would continue the current condition of no management of the territory on National Forest System lands. No AML would be established, and no gathers would occur on National Forest System lands. The population of the horses would be allowed to grow unchecked.

Other existing activities, including permitted livestock grazing, would continue to occur, and new independent actions could be analyzed and implemented under separate environmental analysis. The no-action alternative would not address the need to establish population management actions so that herd sizes can be monitored and maintained within the established AML range or comply with current Apache-Sitgreaves LMP direction.

The no action alternative would not meet the requirements under the Act and the case no. CV-05-2754-PHX-FJM court order. The Apache-Sitgreaves LMP requires the establishment of a territory management plan for the Heber horses, so this alternative would fail to comply with the Apache-Sitgreaves LMP. Additionally, the Act requires Federal Agencies to manage wild horses in a manner designed to achieve a thriving natural ecological balance on public lands. This alternative would not allow the Forests to manage the horse population in a thriving natural ecological balance along with other resources in the area and would therefore not be compliant with this law.

Since this alternative would not be compliant with the Apache-Sitgreaves LMP or in accordance with the Act, it was only analyzed to provide a baseline for conditions on which to analyze the proposed action against.

# Public Involvement

The project has been listed in the Forests' schedule of proposed actions since April 1, 2010.

Between 2010 and 2020, the projects went through the following.

## Scoping Comment Period

A legal notice soliciting public scoping comments (30-day) on the proposed action was published in the *White Mountain Independent* (the newspaper of record) on February 7, 2020. The forest opted to submit a legal notice during scoping, although not required, to ensure that the public was aware of the opportunity to the comment on the proposed action. A scoping letter describing the proposed action was mailed a list of interested parties and those who have previously indicated an interest in the Heber Wild Horses or Black Mesa Ranger District projects, directing them to the Forests' website which contained more information about the project. We notified or consulted with Federal, Tribal, State, and local agencies regarding the proposal (see "Tribal Consultation and Coordination" and "Other Agencies and Individuals Consulted" sections in the Final EA). Information regarding the proposed action was posted on the Forests' project website.

There were 1,206 comment letters from the public and interested parties. Of these, 935 letters were unique containing substantive comments relevant to the project. All other letters were form letters (232) or duplicates (38), containing already-submitted information. The Forest Service interdisciplinary team and district ranger considered all public comments received and organized the comments into concern topics. These concerns, associated comments, and our disposition of each concern are included in the scoping comment disposition spreadsheet available in the project record

and on the project website. The full text of all the comments received were reviewed and incorporated into the project record.

Key comments raised during the 2020 scoping period include the following:

- Horse habitat components of forage, water, cover and space
- Horse herd
- Rangeland vegetation
- Livestock grazing management
- Forage and wildlife species
- Conflicts between people recreating and aggressive horses
- Water quality and quantity
- Soil properties
- Riparian resources
- Impacts to wild horse viewing opportunities
- Impacts to big game animals and subsequent hunting opportunities
- Economic impact to local communities
- Impact to social values of communities of interest

These concerns focused the analysis of potential impacts from the proposed action and the no-action alternatives using indicators to measure and disclose effects for each concern.

## Draft EA Comment Period

The Draft EA and Draft Territory Management Plan official 30-day comment period began March 23, 2021, and ended April 22, 2021. A total of 1,424 comment letters were received of which 1,065 letters were unique letters containing substantive comments relevant to the project. All other letters were form letters (308) or duplicates (51) containing already-submitted information. The full text of all the comments received were reviewed and incorporated into the project record. The consideration and disposition of public comments received during the 30-day comment period of the Draft EA and Draft Territory Management Plan is summarized in Appendix D within the Final EA in accordance with 36 CFR 218(b)(1) for EAs. Comments were reviewed by the IDT to determine if issues or concerns were raised that demonstrated a clear cause-effect relationship and if recommendations/remedies were suggested that would address the issue/concern. The majority of the comments received were organized into the following list of topics and themes related to the proposed action and related impacts from the proposed action:

- Genetic Diversity and Viability
- Horse Population Estimates and Data
- Designation of territory and wild horse status
- Availability and adequacy of water
- Availability and adequacy of forage
- Population control techniques and impacts

- Process for determination of excess horses
- Territory Management Plan
- Terrestrial wildlife
- Fencing concerns
- Socioeconomics
- Recreation
- Cultural Resources

The remaining comments received were organized into the following topics related to the analysis process: NEPA analysis, public involvement and scoping, and suggested alternatives for consideration.

Dispositions that required follow up actions included the need for factual corrections or clarification that were added to the Final EA. No additional alternatives were generated from this comment period. Changes made included the following: factual corrections; supplemented/improved/modified analysis in the Final EA, the Territory Management Plan or supporting documentation; and literature or science considered which was addressed in a separate tracking spreadsheet (located in the project record).

## Tribal Consultation

Consultation letters were sent to the tribes prior to scoping on January 16, 2020. Another letter was sent prior to issuing the Draft EA on March 12, 2021. No concerns regarding historic or traditional properties have been identified through consultation. Tribal governments that have been consulted with on this project include: the Pueblo of Acoma, Fort McDowell Yavapai Nation, Yavapai Prescott, Hopi Tribe, Navajo Nation, Pueblo of Zuni, Mescalero Apache Tribe, San Carlos Apache Tribe, Tonto Apache Tribe, White Mountain Apache Tribe, and Yavapai-Apache Tribe.

## Finding of No Significant Impact

This environmental analysis is conducted according to the Council on Environmental Quality's 1978 regulations for implementing the procedural provisions of the National Environmental Policy Act (40 CFR §1500-1508, as amended). The Council on Environmental Quality issued revised regulations for implementing the procedural provisions of the National Environmental Policy Act, effective September 14, 2020. The revised regulations provide the responsible official the option of conducting an environmental analysis under the 1978 regulations if the process was initiated prior to September 14, 2020 (40 CFR §1506.13, 85 FR 137, page 43373, July 16, 2020). At the time the regulations were passed, scoping (January 2020) had been completed for this project and planning was well underway. Therefore, this decision is consistent with the 1978 regulations.

### Context

Context means the significance of an action must be analyzed in several contexts (local regional, worldwide), and over short- and long-time frames. For site-specific actions, significance usually depends upon the effects in the local rather than in the world as a whole. This project is limited in scope to the analysis conducted but the duration is adaptive in nature in reference to the Territory Management Plan. The Territory Management Plan will be updated as needed as determined by monitoring conditions within the territory and in conjunction with the Final EA. The plan will remain in place indefinitely so long as it is relevant to the wild horse herd.

The selected alternative described in the Final EA is site-specific actions and affect the natural resources of the Black Mesa Ranger District, particularly the Wild Horse Territory. Although there was a fair amount of public interest outside the area, there is no measurable effect to larger portions of Arizona, the region, the Nation, or outside the United States.

Based on these factors, I believe the effects of this project and the resulting Territory Management Plan will be localized and will not contribute to significant environmental effects within or beyond the planning area.

## Intensity

Intensity is a measure of the severity, extent, or quantity of effects, and is based on information from the effects analysis of this Final EA and the references in the project record. The effects of this project have been appropriately and thoroughly considered with an analysis that is responsive to concerns and issues raised by the public. The agency has taken a hard look at the environmental effects using relevant scientific information and knowledge of site-specific conditions gained from field visits.

1. **Impacts may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on the balance the effects will be beneficial.**

   Effects, both beneficial and adverse, and their significance have been evaluated for the selected alternative. None of the adverse effects were determined to be significant, singularly or in combination. The beneficial effects of the action do not bias my finding of no significant environmental effects. The anticipated environmental effects and their intensity have been disclosed for each alternative in the Final EA ("Environmental Impacts Analysis" section). Beneficial impacts were not used to minimize the severity of any adverse impacts.

   The proposed uses of National Forest System lands will not result in any known significant effects on natural or cultural resources including horses, wildlife, rangeland resources, water quality, soils, botanical resources, or social and economic resources (see respective sections of the Final EA for details). Project design criteria will be implemented as part of the decision to avoid or minimize impacts to forest resources. In reaching my conclusion of no significant impacts, I recognize this project is likely to have impacts that are perceived as negative as well as positive.

2. **The degree to which the proposed action affects public health or safety.**

   There were no effects on public health and safety identified from implementation of the proposed action. This project does not conflict with plans or policies of other jurisdictions and is consistent with the Clean Water Act.

3. **Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.**

   There will be no effects on unique characteristics in the area. There are no prime farm or forest lands located within the territory. There are no congressionally designated special areas such as wilderness, inventoried roadless areas, or wild and scenic rivers within the territory.

   The proposed actions will have no adverse effects on cultural resources because all recommended resource protection measures and design criteria will be implemented prior to construction of both temporary and permanent infrastructure. The reduction of the horse population may reduce the potential for damage of cultural sites from trampling or artifact exposure (See cultural heritage specialist report).

The Forests' archaeologists will approve supplementary measures as needed to further protect cultural resources within the project area.

4. **The degree to which the effects on the quality of the human environment are likely to be highly controversial.**

"Highly controversial" in the context of 40 CFR 1508.27(b) (4) refers to substantial disagreement within the scientific community about the environmental effects of the proposed action. It does not refer to expressions of opposition or support or to differences of opinion concerning how public lands should be managed. Although the project may be viewed by some as controversial, the effects of my decision are not likely to be highly controversial in a scientific sense. No evidence has been presented which raises substantial questions as to the correctness of the environmental consequences that have been estimated. The differences in comments reflect a range of opinions, and do not of and by themselves constitute controversy.

After reviewing the project record and Final EA, I am confident the interdisciplinary team reviewed these comments and concerns and incorporated them into alternatives or addressed them in the appropriate resource section (see the Final EA, Appendix D). Portions of the public disagree with various components of the project and have raised concerns related to the proposed action. However, in my judgment, there is not an unusual or high degree of scientific disagreement related to the effects of this project.

5. **The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.**

There are no highly uncertain, unique, or unknown risks identified in this project. The survey and analytical methodologies used to describe the affected environment, and environmental effects follow established practices and requirements. The Final EA did not identify any environmental effects or environmental risks that could not be described using available tools and methodologies. The actions proposed were designed to achieve the objectives identified in the Apache-Sitgreaves LMP, and in conformance with the Act, as amended. The analysis shows the effects of the action are not uncertain and do not involve unique or unknown risks. This conclusion is based on the consideration of results from other similar projects; past local experience; and expected environmental consequences based on the best available science. These effects are well known and documented through similar projects throughout the West.

6. **The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.**

This project does not set a precedent for any future action(s) and follows established procedures and agency roles and responsibilities under the legal and regulatory framework. Under this decision, an AML and population management actions for the territory will be established with an approved territory management plan. Any future adjustments in management for the territory will be based on an evaluation of monitoring data.

7. **Whether the action is related to other actions with individually insignificant but cumulatively significant impacts.**

The cumulative effects of the project, in conjunction with past, present, and reasonably foreseeable future actions, (for example, wild horses, livestock grazing, restoration projects, range improvement construction and maintenance, wildlife, vegetation, watershed, etc.), have been analyzed and found to be relatively minor for all resources. The cumulative impacts have

been analyzed and are not significant. Cumulative effects on each resource are discussed in Appendix A of the Final EA.

8.  The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in the National Register of Historic Places or may cause loss or destruction of significant cultural or historical resources.

### a. Section 106

Potential project activities under the proposed alternative, if determined necessary through monitoring under adaptive management, include but are not limited to the construction of a holding facility, new fence line, installation of new water tanks, and temporary corrals, as necessary. These proposed project activities have the potential to adversely impact historic properties. To mitigate this, design feature Heritage-1 identifies that in order to avoid impacts to heritage sites all undertakings will need a cultural resource inventory and that if any cultural resources are found within the locations identified they will not be utilized or will be modified to avoid impacts to those cultural resources. Inventories shall be conducted in accordance with the stipulations set forth in the *First Amended Programmatic Agreement Regarding Historic Property Protection and Responsibilities*, as agreed upon by the Arizona State Historic Preservation Officer and Region 3 of the USDA Forest Service in 2003 (the PA). By following these guidelines, the projects will be in compliance with Section 106 of the National Historic Preservation Act, as amended, and Section 101(b)(4) of the National Environmental Policy Act of 1969.

### b. Tribal consultation

Tribal consultation on this project was initiated on January 16, 2020. No concerns regarding historic or traditional properties have been identified through consultation. Because the territory shares a boundary with the White Mountain Apache Reservation. While formal consultation is completed, the Forests will continue to coordinate with the tribe as management actions are implemented.

9.  **The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act.**

This project complies with the Endangered Species Act, as amended. With the exception of effects to Mexican Spotted Owl (MSO), the Final Terrestrial and Aquatic Wildlife Biological Assessment (BA) determined the proposed action may affect but is not likely to adversely affect federally listed threatened or endangered species or designated critical habitat, species proposed for federal listing or proposed critical habitat. The BA's determination for effects to MSO was "may affect, likely to adversely affect".

On October 9, 2024, formal consultation was completed with the US Fish & Wildlife Service (USFWS), and a signed Biological Opinion (BO) was issued based on details in the Final BA submitted by the Forest Service. The Final BO concurs with all determinations in the BA, including that the proposed action may affect and is likely to adversely affect MSO but the project's level of anticipated take is not likely to jeopardize the continued existence of MSO, and it may affect but is not likely to adversely affect MSO critical habitat, yellow-billed cuckoo, or Little Colorado spinedace. No take exemption, reasonable and prudent measures, or terms and conditions were provided in the Final BO. All conservation measures identified in the Final BO were incorporated into the final proposed action as design features and the

Forest will continue working with the USFWS to survey recovery habitat and monitor existing protected activity centers (PACs) in the project area as outlined in the conservation recommendations.

10. **Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.**

This action is in conformance with Federal, State, and local laws or requirements related to the protection of the environment. Applicable laws and regulations were considered in my decision as noted in the following sections in the Final EA: "Guiding Law, Regulation and Policy", "Land Management Plan Direction", "Tribal Consultation and Coordination", "Alternatives Considered in Detail", and "Design Criteria and Best Management Practices", and "Appendix C. Findings Required by Law, Regulation, or Policy". Specialist reports, located in the project record, contain additional supporting documentation.

## Conclusion

After considering the environmental effects described in the Final EA and specialist reports, I have determined my decision will not have significant effects on the quality of the human environment considering the context and intensity of impacts. Thus, an environmental impact statement need not be prepared. Proposed activities are consistent with desired conditions, standards and guidelines in the 2015 Apache-Sitgreaves LMP, and all applicable laws, regulations, and policy.

## Findings Required by Other Laws and Regulations

National forest management is guided by various laws, regulations, and policies that provide the framework for all levels of planning. This includes national and regional guides, forest plans, and site-specific planning documents such as this Final EA.

### National Forest Management Act (NFMA)

The Forest Service is currently operating under the 2012 Planning Rule. As required by section 219.15(d) of the 2012 Planning Rule, this project is consistent with the direction found in the amended 2015 Apache-Sitgreaves LMP. This project does not require any forest plan amendments.

The territory overlaps two different management areas: Wild Horse Territory and Community Forest-Intermix Management Area. The Apache-Sitgreaves LMP includes desired conditions, standards, and guidelines for each management area, and this was considered in the development of this project. Desired conditions that this project aims to achieve can be found in the Desired Conditions section of the Final EA.

The Apache-Sitgreaves LMP, Wild Horse Management Area contains the following guideline:

> When horse populations exceed the appropriate management level, horses should be removed in accordance with the "Heber Wild Horse Territory Management Plan" (when completed).

A project or activity is consistent with a guideline even if, "…design varies from the exact words of a guideline, but it is effective in meeting the purpose of the guideline to contribute to the maintenance or attainment of the relevant desired conditions and objectives." The proposed action is consistent with this guideline, and the establishment of this territory plan is necessary for compliance.

### Clean Water Act

I find all applicable State and Federal requirements associated with State water quality laws and the Clean Water Act will be met through planning, application, monitoring and adjustments in conformance with the Clean Water Act and Federal guidance and management direction.

Within the project boundary, Black Canyon Lake was on the State of Arizona 303 (d) List of Impaired Waters due to ammonia but has recently been removed. The original 2004 listing of Black Canyon Lake was soon after the 2002 Rodeo-Chediski Fire, which burned through the project area. Although the watershed specialist report and Final EA note that increased populations of horses could result in increased nutrient deposition in Black Canyon Lake, the increased ammonia levels in 2004 in Black Canyon Lake were likely due to the fire, not the horse use in the area. In the time since the 2004 listing, ammonia levels have decreased despite continued use by horses in the area, providing further support that the ammonia levels were a result of the wildfire. The Final EA notes that increasing horse population levels under Alternative 1 could cause future higher ammonia levels, but it is anticipated that a horse population within AML will not cause detrimental levels of nutrients within the lake. The State of Arizona will continue to monitor this lake for changes.

### Wild Free-Roaming Horses and Burro Act of 1971

A territory management plan has been developed to manage and protect the Heber Wild Horses. It establishes an AML, such that the horses can exist in a thriving natural ecological balance with other multiple uses in the area. The plan identifies specifics for inventorying horses, a strategy to reduce the horse population to within AML, a monitoring and adaptive management process for managing horses within the AML range, and the process by which excess horses would be removed.

### National Historic Preservation Act

The National Historic Preservation Act (NHPA) and the NEPA both require that consideration be given to the potential effects of Federal undertakings on historic resources (including historic and prehistoric cultural resource sites).

Initial consultation regarding the first phase of cultural resources clearance with the Arizona State Historic Preservation Office (AZ SHPO) occurred early in the project, with SHPO concurring on May 7, 2025.

## Administrative Review and Objection Rights

The Heber Wild Horse Territory Management Plan Draft Decision Notice was subject to the objection process, pursuant to 36 CFR part 218, subparts A and B. On August 29, 2025, the legal notice of the opportunity to object to the proposal and availability of the Final EA, finding of no significant impact, and Draft Decision Notice was published in the *White Mountain Independent*, the newspaper of record for the Black Mesa Ranger District. As a result of the government shutdown that occurred during a portion of the administrative review, additional time was added to the Reviewing Officer's written response timeline.

The Forest Service received 30 objections from objectors who had participated in previous designated opportunities for public comment and were eligible to file an objection. Another 17 submissions were received but set aside from administrative review because those objectors had not previously submitted timely, specific written comments regarding the proposed project during designated public comment periods. The Reviewing Officer has considered the concerns presented in the 30 eligible

objections received and findings of the Reviewing Officer are described in the letter addressed to the objectors dated January 26, 2026.

## Modifications Resulting from Administrative Review

In accordance with the instructions provided by the Reviewing Officer, this decision has been updated to clarify and refer to regulation and policy about the Forests' authority for removal of excess horses, including that the authority to administer the Act may be delegated to the Forest Supervisor and this decision authorizes management actions which will be implemented into the foreseeable future in accordance with the Act and Territory Management Plan.

The finding of no significant impact was corrected to show that the proposed action may affect and is likely to adversely affect Mexican Spotted Owl (MSO). Formal consultation was completed with the U.S. Fish and Wildlife Service (USFWS), with the determination by the USFWS that the project's anticipated level of take is not likely to jeopardize the continued existence of MSO or adversely affect critical habitat. USFWS provided no take exemption, reasonable or prudent measures, or terms and conditions in the Final BO dated October 9, 2024.

The Territory Management Plan published during the administrative review period was updated to show that it was the final version on the title page and in headers, and the table of contents was corrected to fix bookmark errors that resulted in some bookmarks not linking to sections of the Territory Management Plan listed in the table of contents. The Territory Management Plan was updated to state that the authority to administer the Act may be delegated to the Forest Supervisor. These updates are considered minor corrections that have no bearing on the overall analysis and supplemental NEPA is not required.

# Implementation

Based upon the January 26, 2026, Objection Response Letter, this decision may be signed once all instructions provided by the Reviewing Officer have been addressed. Implementation may occur immediately upon issuance of this signed Decision Notice.

For further information concerning this project, contact Matthew Bullmore, Black Mesa District Ranger, by email at matthew.bullmore@usda.gov, or by phone at 928-535-7300.

Josh Miller                                             Date
Acting Forest Supervisor
Apache-Sitgreaves National Forests

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the State or local Agency that administers the program or contact USDA through the Telecommunications Relay Service at 711 (voice and TTY). Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at How to File a Program Discrimination Complaint and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Mail Stop 9410, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov.

USDA is an equal opportunity provider, employer, and lender.