Troy B. Froderman (012717)
Rita M. Gara (037349)
FR LAW GROUP PLLC
4745 North 7th Street, Suite 210
Phoenix, AZ 85014
602-566-7425
tfroderman@frlawgroup.com
rgara@frlawgroup.com

Randall M. Weiner (CO Bar No. 23871)
Annmarie Cording (CO Bar No. 42524)
WEINER & CORDING
3100 Arapahoe Avenue, Suite 202
Boulder, Colorado 80303
(303) 440-3321
randall@randallweiner.com
annmarie@weinercording.com
*Pro Hac Vice*
*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Salt River Wild Horse Management Group,<br><br>Plaintiff,<br><br>vs.<br><br>United States Government, Department of Agriculture, Tom Vilsack as acting United States Secretary of Agriculture; United States Forest Service, Robert Lever, acting in his official capacity as Forest Supervisor, Apache-Sitgreaves National Forest and Michiko Martin, acting in her official capacity as Regional Forester, Southwestern Region; Rail Lazy H Contracting and Consulting LLC d/b/a Rail Lazy H; and Johnson County Livestock Exchange,<br><br>Defendants. | Case No. 3:24-cv-08148-JJT<br><br>**SALT RIVER WILD HORSE MANAGEMENT GROUP'S SUPPLEMENTAL PLEADING TO ITS SECOND AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF** |

1

Pursuant to Rule 15(d), the Salt River Wild Horse Management Group ("SRWHMG") supplements its Second Amended Complaint for Declaratory Judgment and Injunctive Relief ("Complaint") filed March 12, 2025, with the following new facts, allegations, complaints and requests for relief.

## BACKGROUND

1.    On June 24, 2024, SRWHMG brought a civil action ("Action") for declaratory and injunctive relief against the United States Forest Service (the "Forest Service" or "USFS") for violating notice requirements related to the livestock auction of horses removed from the Apache-Sitgreaves National Forest in Arizona.[1]

2.    SRWHMG alleged that USFS notice violations have prevented Plaintiff and its members and affiliates from meaningfully participating in such horse auctions.

3.    SRWHMG has also alleged that Defendant Rail Lazy H Contracting and Consulting LLC d/b/a Rail Lazy H ("Lazy H"), who is under contract with the USFS to impound, capture and sell horses in the Apache-Sitgreaves National Forest, has unlawfully prevented SRWHMG from meaningfully participating in its auctions and has engaged in unlawful animal cruelty during the capture, transport, loading and auction of the horses they impound from the Apache-Sitgreaves National Forest.

4.    SRWHMG further alleged that Lazy H has violated federal procurement regulations related to the method and manner in which it executes the sale/auction of the horses.

---

[1] Plaintiff subsequently filed its Second Amended Complaint for Declaratory Judgment and Injunctive Relief ("Complaint") filed March 12, 2025.

2

5. Subsequent to the filing of this Action, SRWHMG learned of further USFS and Lazy H violations of federal law related to the capture, impoundment, notice, and sale of horses from the Apache-Sitgreaves National Forest.

**SUPPLEMENTAL JURISDICTION**

6. Jurisdiction is also proper in this action pursuant to the National Environmental Policy Act (42 U.S.C. Section 4321, et seq.) ("NEPA"); and the Wild Free-Roaming Horses and Burros Act of 1971.

**SUPPLEMENTAL ALLEGATIONS**

7. In passing the Wild Free-Roaming Horses and Burros Act of 1971 ("WHBA"), Congress declared that "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West; that they contribute to the diversity of life forms within the Nation and enrich the lives of the American people; and that these horses and burros are fast disappearing from the American scene. It is the policy of Congress that wild free-roaming horses and burros shall be protected from capture, branding, harassment, or death; and to accomplish this they are to be considered in the area where presently found, as an integral part of the natural system of the public lands." 16 U.S.C. § 1331 et seq.

8. Under the Wild Free-Roaming Horses and Burros Act of 1971, the Secretary of Agriculture is "directed to protect and manage wild free-roaming horses as components of the public lands…". 16 U.S.C. § 1333(a).

9. The term "wild free-roaming horses and burros" is specifically defined under the 1971 Act to mean "all unbranded and unclaimed horses and burros on public lands of the

3

United States." (Emphasis added). 16 U.S.C. Section 1332(a). (*See also* 36 C.F.R. § 222.20 (b)(13) defining Wild free-roaming horses as "…all unbranded and unclaimed horses and burros and their progeny that have used the lands of the National Forest System on or after December December 15, 1971, or do hereafter use these lands as all or part of their habitat, but does not include any horse or burro introduced onto the National Forest System on or after December 15, 1971, by accident, negligence, or willful disregard of private ownership.")

10.    The 1971 Act also states that the Secretary "shall manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1333(a). The Secretary "shall consider the recommendations of qualified scientists in the field of biology and ecology, some of whom shall be independent of both Federal and State agencies…" and the Secretary may "designate and maintain specific ranges on public lands as sanctuaries for their protection and preservation..." 16 U.S.C. § 1333(a).

11.    The 1971 Act further provides that the Secretary "shall maintain a current inventory of wild free-roaming horses and burros on given areas of the public lands." 16 U.S.C. § 1333(b).

12.    Federal Regulations require the Chief of the Forest Service to "*protect*, manage, and control...[the] wild free-roaming horses..." and "shall maintain vigilance for the *welfare*" of the wild free-roaming horses found on the lands of the National Forest System. (emphasis added). 36 C.F.R. § 222.20(a).

13.    In order to effectuate such protections afforded by the WHBA, the USFS designated the Heber Wild Horse Territory ("Territory"), on the Sitgreaves site of the

4

Apache-Sitgreaves National Forest, in 1974 as a designated area for the protected horses. *E.g.*, **Exhibit 1**, *Final Decision Notice and Finding of No Significant Impact for the Heber Wild Horse Territory Management Plan Environmental Assessment* ("January Notice"), p. 1.

14.    On January 29, 2026, acting USFS Forest Supervisor Joshua Miller ("Miller") executed a Final Decision Notice relating to the management of horses protected under the WHBA. *See*, **Exhibit 1,** January Notice.

15.    Within the January Notice, Miller announced a need to establish a Territory managememt plan, including setting an "appropriate management level" or "AML" and "population management actions" for the territory. **Exhibit 1**, p. 1.

16.    Miller, via the January Notice, determined that the appropriate management level of horses for the Territory was between 50 to 104 horses. **Exhibit 1**, p. 2.

17.    This determination was arrived at after a purportedly significant "in-depth multi-tier analysis process" that considered an analysis of resources in the Territory, fertility concerns, horse herd monitoring and adaptive management, infrastructure, the natural ecological condition of the Territory, and the balance between the management of the horses against other uses and users of the Territory. **Exhibit 1**, pp. 2-6.

18.    Stunningly, on March 9, 2026, acting USFS Forest Supervisor Joshua Miller executed a determination letter finding that *zero* protected Wild Free-Roaming Horses exist in the Sitgreaves Forest and that all "unclaimed" horses "currently present on the Sitgreaves" have no WHBA protection and will summarily be treated as unauthorized livestock. **Exhibit 2**, March 9, 2026 Determination Letter ("March Letter").

19.    Miller's support for such re-classification of the horses is thinly, disingenuously and summarily propped up by the assertion that the only horses currently present in the Sitgreaves Forest are not the progeny of Wild Free-Roaming Horses and therefore, not entitled to WHBA protection. **Exhibit 2**.

20.    Miller cites disputed "documentation" from the 1990's that purportedly established a horse population of zero. **Exhibit 2.**

21.    According to Miller's determination criteria, there would be no need for horse management since at least as early as 1997.

22.    Notably however, a 2007 court-approved stipulation expressly established that:

a.   The Heber Wild Horse Territory still existed;

b.   The USFS would work with the public and the Plaintiff in the matter to develop a written Heber Wild Horse Territory Management Strategy;

c.   The USFS would refrain from gathering or removing horses within the Heber Wild Horse Territory, as well as, on the Black Mesa and Lakeside Ranger Districts (considered the Sitgreaves National Forest) until the Forest Service "completes with public involvement, an analysis and appropriate environmental document pursuant to NEPA and develops a written Heber Wild Horse Territory Management Strategy. The Forest Service will involve the public, including the Plaintiffs, in scoping for this analysis. The Forest Service will provide Plaintiffs with specific notice of the document and consider Plaintiffs' comments on the same..."

**Exhibit 3**, March 14, 2007 Stipulation Agreement and Approving Order.

23.    The March Letter also renders the January Notice, executed just five weeks earlier, as well as the "in-depth multi-tier analysis process," useless and an utter waste of time and resources, considering that the information relied on by Miller for his March Letter determination has apparently been known to the Forest service for nearly thirty years.

24.    Miller's complete departure, in the March Letter, from his horse management plan announced in the January Notice violates protections provided by the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, et seq.

25.    The National Environmental Policy Act, or "NEPA", establishes a national policy for the environment through which it seeks to promote, among other things, the preservation of "important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity, and variety of individual choice". 42 U.S.C. § 4331(b)(4).

26.    NEPA provides certain protections for the environment including the requirement that the "responsible agency official" submit a statement detailing the environmental impact a major federal action will have *prior* to that action taking place. 42 U.S.C. § 4321, et seq.

27.    In drastically changing its course of action with its March Notice, the USFS failed to comply with its requirements under NEPA.

28.    Additionally, as a result of the USFS' decision to change the designation of the horses found in the Sitgreaves Forest, and upon information and belief, some horses have already been or are at risk of being directly or indirectly sent to slaughterhouses in Mexico, impacting SRWHMG's ability and opportunity to participate in horse auctions.

29.     Miller, bolstered by his March Letter, executed a Notice of Intent to Impound Unauthorized Livestock in the Black Mesa and Lakeside Forest Service Districts on April 2, 2026. **Exhibit 4**, "Impound Notice"**.**

30.     The Impound Notice reflected the Forest Service's intent to impound, via federal officials and contractors, animals identified as "unauthorized livestock". **Exhibit 4**.

31.     This series of events essentially (and unlawfully) endorses the complete removal of all protected Wild-Free Roaming Horses in the Apache-Sitgreaves National Forest.

32.     The Impound Notice advised the public that any potential impoundment would begin on or after April 27, 2026.

33.     In direct violation of its public notice, the USFS and/or its agents or contractors, began impounding horses on or before April 21, 2026. *See*, **Exhibit 5**, Declaration of Christian Fellhoelter.

34.     Upon information and belief, the USFS and/or its agents or contractors, including, Defendant Rail Lazy H, continue to endanger animals by their use of exposed barbed wire and protruding metal twist ties in fencing/corrals constructed to facilitate the impoundment and/or management of the horses. **Exhibit 5, Declaration of Christian Fellhoelter.**

35.     The method and manner of construction of the fencing/corrals used to aid in the gathering and impoundment of the horses exposes the horses to potential injury and/or escape.

36.     Such horse management activities violate the USFS' obligations under Federal Regulations requiring the Chief of the Forest Service to "*protect*, manage, and control...[the] wild free-roaming horses..." and " maintain vigilance for the *welfare*" of the wild free-roaming horses found on the lands of the National Forest System. (emphasis added). 36 C.F.R. § 222.20(a).

37.     It also violates the Bureau of Land Management's ("BLM") Comprehensive Animal Welfare Program ("CAWP") standards, a program developed in response to the mandates set forth by the WHBA, to ensure that wild horses and burros "receive the best possible care throughout their entire journey, from gather to adoption." *See*, **Exhibit 6**, Bureau of Land Management Website Information; and **Exhibit 7**, BLM's CAWP.

**SUPPLEMENTAL CLAIMS**

**THIRD CLAIM**
**VIOLATION OF APA**

38.     Plaintiff incorporates by reference and re-alleges all allegations set forth above and in its Complaint.

39.     The Forest Service's failure to comply with the notice requirements discussed herein constitutes arbitrary and capricious agency action, is an abuse of discretion, and is contrary to law and to procedures required by law. 5 U.S.C. § 706(2)(A), (D).

40.     As such, Defendants' actions should be held unlawful and set aside.

**FOURTH CLAIM**
**VIOLATION OF APA**

41.     Plaintiff incorporates by reference and re-alleges all allegations set forth above and in its Complaint.

9

42.     The Forest Service's and Lazy H's failure to comply with the Federal procurement and other regulations and laws in the conduct of its gathering, impoundment, transfer, and auctions as discussed herein constitutes arbitrary and capricious agency action, is an abuse of discretion, and is contrary to law and to procedures required by law. 5 U.S.C. § 706(2)(A), (D).

43.     As such, Defendants' actions should be held unlawful and set aside.

## FIFTH CLAIM
## VIOLATION OF NEPA

44.     Plaintiff incorporates by reference and re-alleges all allegations set forth above and in its Complaint.

45.     NEPA provides certain protections for the environment including the requirement that the "responsible agency official" submit a statement detailing the environmental impact a major federal action will have *prior* to that action taking place.  42 U.S.C. § 4321, et seq.

46.     Specific relevant NEPA requirements include the following:

(2)     [A]ll agencies of the Federal Government shall-***

**(C)**     include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

**(i)**     the environmental impact of the proposed action,

**(ii)**     any adverse environmental effects which cannot be avoided should the proposal be implemented,

**(iii)**     alternatives to the proposed action,

**(iv)**     the relationship between local short-term uses of man's environment and

10

the maintenance and enhancement of long-term productivity, and

**(v)**     any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of title 5, and shall accompany the proposal through the existing agency review processes;

42 U.S.C. § 4332(C).

47.     The U.S. Forest Service failed to prepare or issue an Environmental Impact Statement in connection with its March Notice.

48.     The actions of capturing, permanently removing, and selling horses living on the Sitgreaves National Forest constitute a Major Federal Action which necessitates compliance with NEPA provisions, including the requirement that an EIS be prepared.

49.     Actions to remove the horses from the Sitgreaves National Forest could have a significant effect on the surrounding environment and on the many people that study, view, and enjoy these horses.

50.     Defendants have failed to comply with NEPA before ordering the removal of horses from the Sitgreaves National Forest.

51.     In the alternative, Defendants produced a faulty environmental assessment in August 2025 and issued an improper FONSI on January 29, 2026 (based in part on a 2007 court order) which provide an inadequate and illegal basis for determining that the horses are

11

"unauthorized livestock," and the decision to label them so is arbitrary and capricious and a violation of NEPA and the APA.

52.    Under the Declaratory Judgment Act, 28 U.S.C. 2201, an actual controversy has arisen between Plaintiff and Defendants involving the interpretation of certain federal statutes and acts within this Court's jurisdiction.

53.    Absent declaratory and injunctive relief, SRWHMG and its members will suffer immediate and irreparable harm.

### SIXTH CLAIM
**Violation of the Wild Free-Roaming Horses and Burros Act of 1971**

54.    Plaintiff incorporates by reference and re-alleges all allegations set forth above and in its Complaint.

55.    Under the Wild Free-Roaming Horses and Burros Act of 1971, the Secretary of Agriculture is "directed to protect and manage wild free-roaming horses as components of the public lands…". 16 U.S.C. § 1333(a).

56.    The term "wild free-roaming horses and burros" is specifically defined under the 1971 Act to mean "all unbranded and unclaimed horses and burros on public lands of the United States." (Emphasis added). 16 U.S.C. Section 1332(a). (*See also* 36 C.F.R. § 222.20 (b)(13) defining Wild free-roaming horses as "…all unbranded and unclaimed horses and burros and their progeny that have used the lands of the National Forest System on or after December December 15, 1971, or do hereafter use these lands as all or part of their habitat, but does not include any horse or burro introduced onto the National Forest System on or after December 15, 1971, by accident, negligence, or willful disregard of private ownership.")

57.     The 1971 Act also states that the Secretary "shall manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1333(a). The Secretary "shall consider the recommendations of qualified scientists in the field of biology and ecology, some of whom shall be independent of both Federal and State agencies…" and the Secretary may "designate and maintain specific ranges on public lands as sanctuaries for their protection and preservation..." 16 U.S.C. § 1333(a).

58.     The 1971 Act further provides that the Secretary "shall maintain a current inventory of wild free-roaming horses and burros on given areas of the public lands." 16 U.S.C. § 1333(b).

59.     Section 1338a of the 1971 Act provides that while the Secretary may use or contract for the use of motor vehicles for the purpose of transporting captured animals, such use can only be undertaken after a public hearing, among other things.

60.     The Defendants have made an uninformed and unilateral decision to remove an unidentified number of horses from the Sitgreaves National Forest, irresponsibly categorizing them as "unauthorized livestock" without performing their due diligence.

61.     The decision to capture and remove horses from the Sitgreaves National Forest was made without an inventory or accounting of the horses to determine their status as wild or domestic trespass, branded versus unbranded.

62.     Defendant's decision to remove the horses is unsupported by any meaningful investigation, evidence, or inventory. The U.S. Forest Service failed to support their

13

conclusion that the horses they intend to capture and remove are not wild free-roaming horses or offspring of those horses.

63. Upon information and belief, no public hearing was held prior to the decision to re-classify, capture and remove these horses.

64. The Defendants have failed to manage the horses in the Sitgreaves National Forest in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands."

65. The Defendants have failed to conduct an inventory or census the number, types, age, and condition of the horses in the Apache-Sitgreaves National Forest.

66. The Defendants have failed to protect and maintain vigilance for the welfare of the horses.

67. Under the Declaratory Judgment Act, 28 U.S.C. 2201, an actual controversy has arisen between Plaintiff and Defendants involving the interpretation of certain federal statutes and acts within this Court's jurisdiction.

68. Absent declaratory and injunctive relief, SRWHMG and its members will suffer immediate and irreparable harm.

**SUPPLEMENTAL REQUEST FOR RELIEF**

Plaintiff respectfully requests that this Court enter judgment in its favor and against Defendants and provide the following relief:

1. Declare that Defendants violated the APA in that they failed to comply with notice requirements for impoundment of the wild horses;

2. Declare that Defendants violated the APA in that they failed to comply

14

with Federal procurement laws and other federal regulations and laws related to the gather, impoundment, transfer and sale of the horses, as well as laws and regulations designed to protect animal welfare;

3.    Declare that Defendants violated the APA in the utilization of the unauthorized livestock regulations;

4.    Declare that Defendants violated the provisions of NEPA;

5.    Declare that Department of Agriculture and U.S. Forest Service, and their respective agents and acting representatives, have violated the provisions of the Wild Free-Roaming Horse and Burros Act of 1971 and that they have an obligation to comply with said provisions of the Act.

6.    Enjoin Defendants from proceeding with the gather, impoundment, sale, auction, removal, or killing of Horses found on the Sitgreaves National Forest until such time as they are in compliance with all relevant laws and regulations;

RESPECTFULLY SUBMITTED this 23rd day of April 2026.

FR LAW GROUP PLLC

By:_____
Troy B. Froderman, Esq.
Rita M. Gara, Esq.

WEINER & CORDING
Randall M. Weiner, Esq.
Annmarie Cording, Esq.

*Attorneys for Plaintiff*

15

# EXHIBIT 1

# Final Decision Notice and Finding of No Significant Impact for the Heber Wild Horse Territory Management Plan Environmental Assessment

USDA Forest Service
Black Mesa Ranger District
Apache-Sitgreaves National Forests
Coconino and Navajo Counties, Arizona

## Introduction

The Heber Wild Horse Territory (territory) is located in the Black Canyon area of the Black Mesa Ranger District, Apache-Sitgreaves National Forests (Forests) and consists of approximately 19,700 acres. The territory boundary was established and delineated in 1974 following an inventory conducted by the former Heber Ranger District (USDA Forest Service 1974) to address the mandates of the Wild Free-Roaming Horses and Burros Act of 1971 (the Act). The territory is approximately 2.5 to 3 miles wide by about 7 miles long, centered about 5 miles southwest of Heber-Overgaard, Arizona in Coconino and Navajo Counties. The designated boundary runs roughly in a north-easterly direction from its southern boundary on National Forest System Road 300 to the northern boundary, which is private land. The north-northeastern portion of the territory is bounded by the community of Heber-Overgaard, with houses, roads, and fences. The west-northwest flank of the territory is bound by the Highway 260 corridor fence. The southeast flank is an irregular boundary comprised of ridgelines, drainages, and section lines. The Mogollon Rim, with its steep canyons and ridges, lies to the south of the territory. The territory occurs within the Wild Horse Management Area (19,700 acres) and the Community-Forest Intermix Management Area (939 acres) of the 2015 Apache-Sitgreaves National Forests Land Management Plan (Apache-Sitgreaves LMP).

There is a need to establish a territory management plan which includes setting an appropriate management level (AML) and population management actions for the territory. An AML is required by the forest land management plan and guidance with applicable laws and regulations, including but not limited to 36 CFR Part 222, Subpart D. Establishing an AML would ensure wild and free-roaming horses reach and maintain the agency's goal of sustaining these animals in a thriving natural ecological balance within the established territory boundaries.

Therefore, the purpose of this project is to establish a range with lower and upper AMLs for the territory. Another purpose of this project is to identify population management actions to maintain a healthy horse herd while also maintaining a thriving natural ecological balance, as described in the Heber Wild Horse Territory Management Plan Final Environmental Assessment (EA)[1].

---

[1] The environmental assessment is available on the project website.

To maintain a healthy herd within a thriving natural ecological balance, an in-depth multi-tier analysis process (USDI Bureau of Land Management Handbook H-4700-1)[2] was conducted in accordance with 36 CFR 222.21(a)(4). Based on this analysis, the Forest Service found an AML of 50 to 104 horses based on the resources available within the territory to support an upper limit of 104 free-roaming horses. This range of horses will result in a thriving natural ecological balance and avoids deterioration of the range while still meeting management direction for other resources.

The Final EA provides more detail regarding the project purpose and need; and its consistency with law, regulation, and other direction.

## Decision

Based upon my review of alternatives, I have decided to select alternative 2, the proposed action, which will maintain the horse population associated with the territory in a thriving natural ecological balance with other uses and within the productive capacity of their habitat. This decision includes adopting the Heber Wild Horse Final Territory Management Plan (Territory Management Plan) based on the proposed action that includes standard operating procedures and an annual operating plan for implementation. Specifically, this decision and the Territory Management Plan will:

- Establish the AML of 50 to 104 horses.

- Allow for a determination of excess animals. The Forest Supervisor, the official with delegated authority under Forest Service Manual (FSM) 2200, will document this determination in a letter to the file.

- Allow for the removal of excess horses to reduce the horse population to the upper end of AML (104 horses), following the actions outlined in the Territory Management Plan.

- Adopt an adaptive management process, based on monitoring and thresholds, to managing horses within the AML range of 50 to 104 horses to achieve a thriving natural ecological balance.

- Both temporary and permanent infrastructure will be built to facilitate the management of horses.

- Implement design criteria to be used for resource protection measures.

- Establish the annual operating plan (AOP) as described in the Territory Management Plan. The AOP will document management actions (horse populations, herd health, or habitat management actions) that will be implemented that year, based on monitoring and adaptive management.

The proposed action has been used to create a Territory Management Plan for the territory. The Territory Management Plan will be in effect indefinitely unless conditions change that would warrant additional environmental analysis and development of an updated territory management plan. The Territory Management Plan is adaptive in nature and can be adjusted as necessary within the limits of this effects analysis.

The best available science was used in making the proposed decision. The project record demonstrates a thorough review of relevant scientific information, consideration of responsible opposing views, and where appropriate, acknowledgment of incomplete or unavailable information, scientific uncertainty, and risk.

---

[2] The USDI Bureau of Land Management Handbook H-4700-1 is considered the best available science and information (BASI) for determining an appropriate management level (AML).

## Appropriate Management Levels (AML)

This decision establishes the lower and upper limits of the AMLs for the territory at 50 to 104 horses based on an in-depth analysis of the resources available within the territory. The analysis is detailed in the *Proposed Appropriate Management Level Determination* document.

The AML determination uses the multi-tier analysis process identified by the Bureau of Land Management (USDI Bureau of Land Management Handbook H-4700-1). After determining the sufficiency of the territory to provide the four essential habitat components of water, forage, cover, and space, the second-tier analysis determines the amount of sustainable forage available for wild horse use, taking into consideration the management objectives of the area. This includes meeting land management plan standards and guidelines for upland vegetation and riparian plant communities, watershed function, and habitat quality for animal populations, including objectives necessary to protect and manage threatened, endangered, and Forest Service sensitive species. The second tier of the analysis included using half of the available forage to establish the high end of the AML. Utilizing one half of the available forage ensures there is still enough forage for the other grazing animals in the area. Tier 2 determined there is enough forage within the territory to support an upper limit of 104 free-roaming horses, while still meeting management direction for other resources. Tier 3 recommends periodic genetic analysis, and if the data show the herd is not maintaining genetic diversity, management actions would be taken.

## Strategy to Reach AML

This decision authorizes the Forest Supervisor or his/her delegate or agent to gather and remove any excess horses located across the Sitgreaves National Forest System lands, working furthest from the territory and progressively moving closer to the territory as outlined in Forest Service Manual (FSM) 2200. If all horses that reside across the Sitgreaves National Forest, are removed through gathers, and the population still exceeds the upper end of AML, horses would be removed from within the territory boundary until the population reaches 104 horses.

To ensure the safe and humane treatment of horses, gathers and handling will be conducted by authorized Forest Service personnel or authorized contractors using standard operating procedures in Bureau of Land Management IM-2015-151, Comprehensive Animal Welfare Program for Wild Horse and Burro Gathers. The standard operating procedures and requirements for bait trapping and helicopter gathers are outlined in the Territory Management Plan Appendix 1.

Gathering horses will typically be done via passive gather techniques such as but not limited to bait trapping. Horses may be lured into a trap site using bait (feed, mineral supplement, water) or sexual attractants (mares in heat). Traps can be located within or outside the territory in any location suitable to gather horses, in adherence to the project design features. Already disturbed areas such as existing livestock corrals, retrofitted for horses, will be used wherever possible. Where existing corrals are not available, a temporary trap site would be constructed. Helicopters may be used to assist during gathers if bait trapping is ineffective.

### Fertility Reduction

This decision also authorizes control of horse populations by treating with contraceptives. Population control techniques will be prioritized for use by the least invasive and least disruptive methods to horse bands and horse behavior. Horses closest to the territory will be treated first, moving progressively further from the territory until AML is reached. Contraceptives will continue to be used when needed based on monitoring within the adaptive management process.

Fertility reduction would be used to slow the rate of horse population growth and achieve the desired AML while allowing for genetic diversity. Some of the licensed fertility reduction control agents currently available for use include injectable agents such as various formulations of porcine zona pellucida (PZP), gonadotropin releasing hormone (also known as Gonacon), and other agents being developed such as growth and differentiation factor 9 (GDF-9) and bone morphogenetic factor 15 (BMP-15). Horses would be treated using an approved method including but not limited to bait trap, treat and release or using a darting method. Intrauterine devices such as the Y-shaped silicone intrauterine device for horses may be used in horses that are gathered but will be returned to the territory. For further information see the Territory Management Plan, Appendix 3.

*Gathers for Horses to Remain on or be Relocated to the Territory*

Handling corrals may be needed to temporarily hold and care for horses and implement management activities for horses that would remain on the territory. Management activities may include but are not limited to the following: administering fertility controls, vaccinations, or other health related needs; installing microchips or tracking collars; and collecting samples needed for genetic or other testing. Existing livestock corrals will be used that have been retrofitted to meet animal welfare standards, where possible. Two permanent handling corrals will be located within the territory. If needed, other temporary handling corrals less than an acre in size may occur within the territory or outside the territory on the Sitgreaves National Forest.

*Gathers and Removal for Excess Horses*

In accordance with the Act, gathered excess horses would be temporarily held in a permanently constructed holding facility to process horses for adoption, sale, or off-forest relocation. The preference is that gathered excess horses would be offered for adoption. They would be offered for sale if they are not adopted after three attempts at three different events or are over 10 years old. If not sold, they could be relocated to another territory or long-term facility. Lastly, in accordance with 222.69(c)(1), in the most humane manner possible, sick, lame, or old animals would be euthanized.

## Monitoring and Adaptive Management

Monitoring and adaptive management will be used to manage the horse herd once the population of horses has been reduced to the upper end of AML. By monitoring and assessing conditions of the land and horse herd, forest service managers will have the ability to adapt and make changes to their management practices to ensure a thriving natural ecological balance with other resources in this area.

The monitoring questions, thresholds, and management actions are found in the Final EA, Table 2. Each row lists indicators, monitoring questions, thresholds, and management actions that could be chosen. The Forest Supervisor in coordination with the Black Mesa Ranger District will have the option to choose which management action may be appropriate if a monitoring threshold is reached.

## Infrastructure

This project will require both permanent and temporary infrastructure needed to manage the horses.

A 61-acre area south of Highway 260 near mile marker 300 was analyzed for disturbance to build a permanently constructed holding facility. This area will contain both smaller and larger corrals for holding horses, a parking area large enough to hold many trucks and horse trailers, manure storage, hay barn, 2 camping pads with both water and electricity, a well, and other storage facilities as needed. The entire area was analyzed for disturbance so the facility could expand as needed based on horse populations and infrastructure needs associated with their management.

Two permanently constructed handling facilities will be located with the territory. Handling corrals will be used to administer contraceptives, vaccines, take blood samples, radio collar, or other activities which require the short-term handling of the horses. On the north side of the territory, a fence will be constructed along an existing roadway to connect with two already existing fences to create a large triangle of approximately 100 acres. Inside this area, 2 1-acre corrals and a water tank will be constructed. On the south side of the territory, a 1-acre corral would be constructed around two existing stock tanks (Zig Zag 1 and 2). Other temporary handling facilities (corrals) may be constructed as needed across the Sitgreaves National Forest as managers work to reduce horse populations with within AML. These sites will be temporary and built in previously disturbed sites when possible.

Traps will be used across the Sitgreaves National Forest, including inside the territory if needed, to gather horses.

A 10-foot-high fence will surround the 61-acre holding facility. Approximately 3 miles of barbwire fence will be built to encompass the handling facility on the northern end of the territory, adhering to fence design features that are wildlife friendly and to protect wildlife.

Additional water sources may be created based on monitoring and adaptive management.

All infrastructure improvements will adhere to project design criteria and the 2015 Apache-Sitgreaves LMP.

## Design Criteria

My decision includes design criteria for avoiding and minimizing impacts to Sitgreaves National Forest resources (see Table 3 of the Final EA**Error! Bookmark not defined.**).

## Annual Operating Plan (AOP)

Annual operating plans will outline the strategy for management for the year. The AOP will provide the specific activities necessary for management of the horses and the territory in accordance with the Territory Management Plan and the selected action. This will include items such as horse gather details, fertility management, infrastructure construction and maintenance, resource protection and improvements, and monitoring requirements and documentation.

## Unauthorized Livestock

On the Sitgreaves National Forest, horses not meeting the definition of wild horse as defined in 36 CFR 222.60(b)(13) would be considered unauthorized livestock and removed per 36 CFR 222.63 and state law, as applicable. This would occur in consultation with Arizona Department of Agriculture brand inspectors, tribal livestock inspectors, or conservation offers.

## Thriving Natural Ecological Balance

The Territory Management Plan includes actions that strive to meet a thriving natural ecological condition. A thriving natural ecological balance can be described as balancing wild horse management with other multiple uses, which assures appropriate progress is made toward meeting desired conditions, standards, and guidelines identified in the 2015 Apache-Sitgreaves LMP. This includes considering upland vegetation and riparian plant communities, watershed function, and habitat quality for animal populations. It also includes other site-specific or landscape-level objectives, such as those necessary to protect and manage threatened, endangered, and sensitive species. To help meet a thriving

natural ecological balance. This includes strategies to ensure forage, water, soil, vegetation, key habitats are in healthy condition and providing for the needs of the horses and other multiple uses.

## Decision Rationale

After examining the purpose and need and alternatives, I have decided to select the proposed action. My decision establishes an AML and population management actions outlined in the Territory Management Plan for the territory. My decision also allows for the management of the Heber horse herd in a way that is flexible, based on the results of monitoring, and that sustains the natural resources within, and surrounding, the project area. My decision also manages the territory and horse herd as a self-sustaining population of healthy animals in a thriving natural ecological balance with other uses and within the productive capacity of their habitat as required by Public Law 92-195, the Wild Free-Roaming Horses and Burros Act of 1971, as amended.

Based on the AML determination analysis, a population of 50 to 104 horses will ensure adequate forage and water supplies to support the herd on a year-long basis for the long term. Maintaining the horse population at this AML range will maintain the existing healthy rangeland vegetation plant communities within the territory. As well, managing the population within the AML would reduce the density of horses and thus reduce competition for resources, allowing horses to utilize preferred and quality habitat.

The modeling conducted as part of the project analysis predicts how long it would take to reach the AML; however, this is not an absolute prediction. Horse populations continue to grow; this along with factors such as funding and availability of individuals and groups to adopt horses will ultimately determine the time it takes to reach the AML.

The implementation of fertility control can result in improved longevity and lengthen generation time which is expected to slow the rate of genetic diversity loss. I believe implementation of the adaptive management monitoring plan, which includes monitoring the herd genetics and possible herd augmentation, will allow us to maintain genetic diversity objectives for this herd.

Finally, the decision includes design criteria to avoid or minimize potential negative environmental impacts, address comments and concerns raised by both the public and interdisciplinary team members during the development and analysis of the project and meet our multiple-use mission. By identifying necessary project design features and analyzing the environmental consequences of the proposed action and alternatives, potential impacts to cultural resources, horses, wildlife, rangeland resources and vegetation, water quality, soils, botanical resources, and social and economic resources were considered.

## Alternatives Considered

In making my decision, I considered seven additional alternatives besides the selected alternative. Six alternatives were considered and dismissed from detailed analysis. These alternatives include: 1) original proposed action, including sterilization of horses; 2) fencing Black Canyon Lake; 3) expanding the territory; 4) setting appropriate management level; 5) increasing the appropriate management level; and 6) reducing authorized livestock grazing to allow for a higher appropriate management level. These alternatives were not considered in detail based on analysis conducted and failure to meet the purpose and need for action. For more details on why each alternative was eliminated from detailed study, please see the alternatives considered but dismissed from detailed analysis section of the Final EA. As such, only two alternatives were considered in detail: the no-

action alternative and proposed action. The Final EA provides a comparison of the effects from each of the alternatives considered in detail.

## No Action

The no-action alternative would continue the current condition of no management of the territory on National Forest System lands. No AML would be established, and no gathers would occur on National Forest System lands. The population of the horses would be allowed to grow unchecked.

Other existing activities, including permitted livestock grazing, would continue to occur, and new independent actions could be analyzed and implemented under separate environmental analysis. The no-action alternative would not address the need to establish population management actions so that herd sizes can be monitored and maintained within the established AML range or comply with current Apache-Sitgreaves LMP direction.

The no action alternative would not meet the requirements under the Act and the case no. CV-05-2754-PHX-FJM court order. The Apache-Sitgreaves LMP requires the establishment of a territory management plan for the Heber horses, so this alternative would fail to comply with the Apache-Sitgreaves LMP. Additionally, the Act requires Federal Agencies to manage wild horses in a manner designed to achieve a thriving natural ecological balance on public lands. This alternative would not allow the Forests to manage the horse population in a thriving natural ecological balance along with other resources in the area and would therefore not be compliant with this law.

Since this alternative would not be compliant with the Apache-Sitgreaves LMP or in accordance with the Act, it was only analyzed to provide a baseline for conditions on which to analyze the proposed action against.

# Public Involvement

The project has been listed in the Forests' schedule of proposed actions since April 1, 2010.

Between 2010 and 2020, the projects went through the following.

## Scoping Comment Period

A legal notice soliciting public scoping comments (30-day) on the proposed action was published in the *White Mountain Independent* (the newspaper of record) on February 7, 2020. The forest opted to submit a legal notice during scoping, although not required, to ensure that the public was aware of the opportunity to the comment on the proposed action. A scoping letter describing the proposed action was mailed a list of interested parties and those who have previously indicated an interest in the Heber Wild Horses or Black Mesa Ranger District projects, directing them to the Forests' website which contained more information about the project. We notified or consulted with Federal, Tribal, State, and local agencies regarding the proposal (see "Tribal Consultation and Coordination" and "Other Agencies and Individuals Consulted" sections in the Final EA). Information regarding the proposed action was posted on the Forests' project website.

There were 1,206 comment letters from the public and interested parties. Of these, 935 letters were unique containing substantive comments relevant to the project. All other letters were form letters (232) or duplicates (38), containing already-submitted information. The Forest Service interdisciplinary team and district ranger considered all public comments received and organized the comments into concern topics. These concerns, associated comments, and our disposition of each concern are included in the scoping comment disposition spreadsheet available in the project record

and on the project website. The full text of all the comments received were reviewed and incorporated into the project record.

Key comments raised during the 2020 scoping period include the following:

- Horse habitat components of forage, water, cover and space
- Horse herd
- Rangeland vegetation
- Livestock grazing management
- Forage and wildlife species
- Conflicts between people recreating and aggressive horses
- Water quality and quantity
- Soil properties
- Riparian resources
- Impacts to wild horse viewing opportunities
- Impacts to big game animals and subsequent hunting opportunities
- Economic impact to local communities
- Impact to social values of communities of interest

These concerns focused the analysis of potential impacts from the proposed action and the no-action alternatives using indicators to measure and disclose effects for each concern.

## Draft EA Comment Period

The Draft EA and Draft Territory Management Plan official 30-day comment period began March 23, 2021, and ended April 22, 2021. A total of 1,424 comment letters were received of which 1,065 letters were unique letters containing substantive comments relevant to the project. All other letters were form letters (308) or duplicates (51) containing already-submitted information. The full text of all the comments received were reviewed and incorporated into the project record. The consideration and disposition of public comments received during the 30-day comment period of the Draft EA and Draft Territory Management Plan is summarized in Appendix D within the Final EA in accordance with 36 CFR 218(b)(1) for EAs. Comments were reviewed by the IDT to determine if issues or concerns were raised that demonstrated a clear cause-effect relationship and if recommendations/remedies were suggested that would address the issue/concern. The majority of the comments received were organized into the following list of topics and themes related to the proposed action and related impacts from the proposed action:

- Genetic Diversity and Viability
- Horse Population Estimates and Data
- Designation of territory and wild horse status
- Availability and adequacy of water
- Availability and adequacy of forage
- Population control techniques and impacts

- Process for determination of excess horses

- Territory Management Plan

- Terrestrial wildlife

- Fencing concerns

- Socioeconomics

- Recreation

- Cultural Resources

The remaining comments received were organized into the following topics related to the analysis process: NEPA analysis, public involvement and scoping, and suggested alternatives for consideration.

Dispositions that required follow up actions included the need for factual corrections or clarification that were added to the Final EA. No additional alternatives were generated from this comment period. Changes made included the following: factual corrections; supplemented/improved/modified analysis in the Final EA, the Territory Management Plan or supporting documentation; and literature or science considered which was addressed in a separate tracking spreadsheet (located in the project record).

## Tribal Consultation

Consultation letters were sent to the tribes prior to scoping on January 16, 2020. Another letter was sent prior to issuing the Draft EA on March 12, 2021. No concerns regarding historic or traditional properties have been identified through consultation. Tribal governments that have been consulted with on this project include: the Pueblo of Acoma, Fort McDowell Yavapai Nation, Yavapai Prescott, Hopi Tribe, Navajo Nation, Pueblo of Zuni, Mescalero Apache Tribe, San Carlos Apache Tribe, Tonto Apache Tribe, White Mountain Apache Tribe, and Yavapai-Apache Tribe.

## Finding of No Significant Impact

This environmental analysis is conducted according to the Council on Environmental Quality's 1978 regulations for implementing the procedural provisions of the National Environmental Policy Act (40 CFR §1500-1508, as amended). The Council on Environmental Quality issued revised regulations for implementing the procedural provisions of the National Environmental Policy Act, effective September 14, 2020. The revised regulations provide the responsible official the option of conducting an environmental analysis under the 1978 regulations if the process was initiated prior to September 14, 2020 (40 CFR §1506.13, 85 FR 137, page 43373, July 16, 2020). At the time the regulations were passed, scoping (January 2020) had been completed for this project and planning was well underway. Therefore, this decision is consistent with the 1978 regulations.

### Context

Context means the significance of an action must be analyzed in several contexts (local regional, worldwide), and over short- and long-time frames. For site-specific actions, significance usually depends upon the effects in the local rather than in the world as a whole. This project is limited in scope to the analysis conducted but the duration is adaptive in nature in reference to the Territory Management Plan. The Territory Management Plan will be updated as needed as determined by monitoring conditions within the territory and in conjunction with the Final EA. The plan will remain in place indefinitely so long as it is relevant to the wild horse herd.

The selected alternative described in the Final EA is site-specific actions and affect the natural resources of the Black Mesa Ranger District, particularly the Wild Horse Territory. Although there was a fair amount of public interest outside the area, there is no measurable effect to larger portions of Arizona, the region, the Nation, or outside the United States.

Based on these factors, I believe the effects of this project and the resulting Territory Management Plan will be localized and will not contribute to significant environmental effects within or beyond the planning area.

## Intensity

Intensity is a measure of the severity, extent, or quantity of effects, and is based on information from the effects analysis of this Final EA and the references in the project record. The effects of this project have been appropriately and thoroughly considered with an analysis that is responsive to concerns and issues raised by the public. The agency has taken a hard look at the environmental effects using relevant scientific information and knowledge of site-specific conditions gained from field visits.

1. **Impacts may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on the balance the effects will be beneficial.**

   Effects, both beneficial and adverse, and their significance have been evaluated for the selected alternative. None of the adverse effects were determined to be significant, singularly or in combination. The beneficial effects of the action do not bias my finding of no significant environmental effects. The anticipated environmental effects and their intensity have been disclosed for each alternative in the Final EA ("Environmental Impacts Analysis" section). Beneficial impacts were not used to minimize the severity of any adverse impacts.

   The proposed uses of National Forest System lands will not result in any known significant effects on natural or cultural resources including horses, wildlife, rangeland resources, water quality, soils, botanical resources, or social and economic resources (see respective sections of the Final EA for details). Project design criteria will be implemented as part of the decision to avoid or minimize impacts to forest resources. In reaching my conclusion of no significant impacts, I recognize this project is likely to have impacts that are perceived as negative as well as positive.

2. **The degree to which the proposed action affects public health or safety.**

   There were no effects on public health and safety identified from implementation of the proposed action. This project does not conflict with plans or policies of other jurisdictions and is consistent with the Clean Water Act.

3. **Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.**

   There will be no effects on unique characteristics in the area. There are no prime farm or forest lands located within the territory. There are no congressionally designated special areas such as wilderness, inventoried roadless areas, or wild and scenic rivers within the territory.

   The proposed actions will have no adverse effects on cultural resources because all recommended resource protection measures and design criteria will be implemented prior to construction of both temporary and permanent infrastructure. The reduction of the horse population may reduce the potential for damage of cultural sites from trampling or artifact exposure (See cultural heritage specialist report).

The Forests' archaeologists will approve supplementary measures as needed to further protect cultural resources within the project area.

4. **The degree to which the effects on the quality of the human environment are likely to be highly controversial.**

"Highly controversial" in the context of 40 CFR 1508.27(b) (4) refers to substantial disagreement within the scientific community about the environmental effects of the proposed action. It does not refer to expressions of opposition or support or to differences of opinion concerning how public lands should be managed. Although the project may be viewed by some as controversial, the effects of my decision are not likely to be highly controversial in a scientific sense. No evidence has been presented which raises substantial questions as to the correctness of the environmental consequences that have been estimated. The differences in comments reflect a range of opinions, and do not of and by themselves constitute controversy.

After reviewing the project record and Final EA, I am confident the interdisciplinary team reviewed these comments and concerns and incorporated them into alternatives or addressed them in the appropriate resource section (see the Final EA, Appendix D). Portions of the public disagree with various components of the project and have raised concerns related to the proposed action. However, in my judgment, there is not an unusual or high degree of scientific disagreement related to the effects of this project.

5. **The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.**

There are no highly uncertain, unique, or unknown risks identified in this project. The survey and analytical methodologies used to describe the affected environment, and environmental effects follow established practices and requirements. The Final EA did not identify any environmental effects or environmental risks that could not be described using available tools and methodologies. The actions proposed were designed to achieve the objectives identified in the Apache-Sitgreaves LMP, and in conformance with the Act, as amended. The analysis shows the effects of the action are not uncertain and do not involve unique or unknown risks. This conclusion is based on the consideration of results from other similar projects; past local experience; and expected environmental consequences based on the best available science. These effects are well known and documented through similar projects throughout the West.

6. **The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.**

This project does not set a precedent for any future action(s) and follows established procedures and agency roles and responsibilities under the legal and regulatory framework. Under this decision, an AML and population management actions for the territory will be established with an approved territory management plan. Any future adjustments in management for the territory will be based on an evaluation of monitoring data.

7. **Whether the action is related to other actions with individually insignificant but cumulatively significant impacts.**

The cumulative effects of the project, in conjunction with past, present, and reasonably foreseeable future actions, (for example, wild horses, livestock grazing, restoration projects, range improvement construction and maintenance, wildlife, vegetation, watershed, etc.), have been analyzed and found to be relatively minor for all resources. The cumulative impacts have

been analyzed and are not significant. Cumulative effects on each resource are discussed in Appendix A of the Final EA.

8. The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in the National Register of Historic Places or may cause loss or destruction of significant cultural or historical resources.

   ### a. Section 106

   Potential project activities under the proposed alternative, if determined necessary through monitoring under adaptive management, include but are not limited to the construction of a holding facility, new fence line, installation of new water tanks, and temporary corrals, as necessary. These proposed project activities have the potential to adversely impact historic properties. To mitigate this, design feature Heritage-1 identifies that in order to avoid impacts to heritage sites all undertakings will need a cultural resource inventory and that if any cultural resources are found within the locations identified they will not be utilized or will be modified to avoid impacts to those cultural resources. Inventories shall be conducted in accordance with the stipulations set forth in the *First Amended Programmatic Agreement Regarding Historic Property Protection and Responsibilities*, as agreed upon by the Arizona State Historic Preservation Officer and Region 3 of the USDA Forest Service in 2003 (the PA). By following these guidelines, the projects will be in compliance with Section 106 of the National Historic Preservation Act, as amended, and Section 101(b)(4) of the National Environmental Policy Act of 1969.

   ### b. Tribal consultation

   Tribal consultation on this project was initiated on January 16, 2020. No concerns regarding historic or traditional properties have been identified through consultation. Because the territory shares a boundary with the White Mountain Apache Reservation. While formal consultation is completed, the Forests will continue to coordinate with the tribe as management actions are implemented.

9. **The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act.**

   This project complies with the Endangered Species Act, as amended. With the exception of effects to Mexican Spotted Owl (MSO), the Final Terrestrial and Aquatic Wildlife Biological Assessment (BA) determined the proposed action may affect but is not likely to adversely affect federally listed threatened or endangered species or designated critical habitat, species proposed for federal listing or proposed critical habitat. The BA's determination for effects to MSO was "may affect, likely to adversely affect".

   On October 9, 2024, formal consultation was completed with the US Fish & Wildlife Service (USFWS), and a signed Biological Opinion (BO) was issued based on details in the Final BA submitted by the Forest Service. The Final BO concurs with all determinations in the BA, including that the proposed action may affect and is likely to adversely affect MSO but the project's level of anticipated take is not likely to jeopardize the continued existence of MSO, and it may affect but is not likely to adversely affect MSO critical habitat, yellow-billed cuckoo, or Little Colorado spinedace. No take exemption, reasonable and prudent measures, or terms and conditions were provided in the Final BO. All conservation measures identified in the Final BO were incorporated into the final proposed action as design features and the

Forest will continue working with the USFWS to survey recovery habitat and monitor existing protected activity centers (PACs) in the project area as outlined in the conservation recommendations.

10. **Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.**

This action is in conformance with Federal, State, and local laws or requirements related to the protection of the environment. Applicable laws and regulations were considered in my decision as noted in the following sections in the Final EA: "Guiding Law, Regulation and Policy", "Land Management Plan Direction", "Tribal Consultation and Coordination", "Alternatives Considered in Detail", and "Design Criteria and Best Management Practices", and "Appendix C. Findings Required by Law, Regulation, or Policy". Specialist reports, located in the project record, contain additional supporting documentation.

## Conclusion

After considering the environmental effects described in the Final EA and specialist reports, I have determined my decision will not have significant effects on the quality of the human environment considering the context and intensity of impacts. Thus, an environmental impact statement need not be prepared. Proposed activities are consistent with desired conditions, standards and guidelines in the 2015 Apache-Sitgreaves LMP, and all applicable laws, regulations, and policy.

## Findings Required by Other Laws and Regulations

National forest management is guided by various laws, regulations, and policies that provide the framework for all levels of planning. This includes national and regional guides, forest plans, and site-specific planning documents such as this Final EA.

### National Forest Management Act (NFMA)

The Forest Service is currently operating under the 2012 Planning Rule. As required by section 219.15(d) of the 2012 Planning Rule, this project is consistent with the direction found in the amended 2015 Apache-Sitgreaves LMP. This project does not require any forest plan amendments.

The territory overlaps two different management areas: Wild Horse Territory and Community Forest-Intermix Management Area. The Apache-Sitgreaves LMP includes desired conditions, standards, and guidelines for each management area, and this was considered in the development of this project. Desired conditions that this project aims to achieve can be found in the Desired Conditions section of the Final EA.

The Apache-Sitgreaves LMP, Wild Horse Management Area contains the following guideline:

When horse populations exceed the appropriate management level, horses should be removed in accordance with the "Heber Wild Horse Territory Management Plan" (when completed).

A project or activity is consistent with a guideline even if, "…design varies from the exact words of a guideline, but it is effective in meeting the purpose of the guideline to contribute to the maintenance or attainment of the relevant desired conditions and objectives." The proposed action is consistent with this guideline, and the establishment of this territory plan is necessary for compliance.

### Clean Water Act

I find all applicable State and Federal requirements associated with State water quality laws and the Clean Water Act will be met through planning, application, monitoring and adjustments in conformance with the Clean Water Act and Federal guidance and management direction.

Within the project boundary, Black Canyon Lake was on the State of Arizona 303 (d) List of Impaired Waters due to ammonia but has recently been removed. The original 2004 listing of Black Canyon Lake was soon after the 2002 Rodeo-Chediski Fire, which burned through the project area. Although the watershed specialist report and Final EA note that increased populations of horses could result in increased nutrient deposition in Black Canyon Lake, the increased ammonia levels in 2004 in Black Canyon Lake were likely due to the fire, not the horse use in the area. In the time since the 2004 listing, ammonia levels have decreased despite continued use by horses in the area, providing further support that the ammonia levels were a result of the wildfire. The Final EA notes that increasing horse population levels under Alternative 1 could cause future higher ammonia levels, but it is anticipated that a horse population within AML will not cause detrimental levels of nutrients within the lake. The State of Arizona will continue to monitor this lake for changes.

### Wild Free-Roaming Horses and Burro Act of 1971

A territory management plan has been developed to manage and protect the Heber Wild Horses. It establishes an AML, such that the horses can exist in a thriving natural ecological balance with other multiple uses in the area. The plan identifies specifics for inventorying horses, a strategy to reduce the horse population to within AML, a monitoring and adaptive management process for managing horses within the AML range, and the process by which excess horses would be removed.

### National Historic Preservation Act

The National Historic Preservation Act (NHPA) and the NEPA both require that consideration be given to the potential effects of Federal undertakings on historic resources (including historic and prehistoric cultural resource sites).

Initial consultation regarding the first phase of cultural resources clearance with the Arizona State Historic Preservation Office (AZ SHPO) occurred early in the project, with SHPO concurring on May 7, 2025.

## Administrative Review and Objection Rights

The Heber Wild Horse Territory Management Plan Draft Decision Notice was subject to the objection process, pursuant to 36 CFR part 218, subparts A and B. On August 29, 2025, the legal notice of the opportunity to object to the proposal and availability of the Final EA, finding of no significant impact, and Draft Decision Notice was published in the *White Mountain Independent*, the newspaper of record for the Black Mesa Ranger District. As a result of the government shutdown that occurred during a portion of the administrative review, additional time was added to the Reviewing Officer's written response timeline.

The Forest Service received 30 objections from objectors who had participated in previous designated opportunities for public comment and were eligible to file an objection. Another 17 submissions were received but set aside from administrative review because those objectors had not previously submitted timely, specific written comments regarding the proposed project during designated public comment periods. The Reviewing Officer has considered the concerns presented in the 30 eligible

objections received and findings of the Reviewing Officer are described in the letter addressed to the objectors dated January 26, 2026.

## Modifications Resulting from Administrative Review

In accordance with the instructions provided by the Reviewing Officer, this decision has been updated to clarify and refer to regulation and policy about the Forests' authority for removal of excess horses, including that the authority to administer the Act may be delegated to the Forest Supervisor and this decision authorizes management actions which will be implemented into the foreseeable future in accordance with the Act and Territory Management Plan.

The finding of no significant impact was corrected to show that the proposed action may affect and is likely to adversely affect Mexican Spotted Owl (MSO). Formal consultation was completed with the U.S. Fish and Wildlife Service (USFWS), with the determination by the USFWS that the project's anticipated level of take is not likely to jeopardize the continued existence of MSO or adversely affect critical habitat. USFWS provided no take exemption, reasonable or prudent measures, or terms and conditions in the Final BO dated October 9, 2024.

The Territory Management Plan published during the administrative review period was updated to show that it was the final version on the title page and in headers, and the table of contents was corrected to fix bookmark errors that resulted in some bookmarks not linking to sections of the Territory Management Plan listed in the table of contents. The Territory Management Plan was updated to state that the authority to administer the Act may be delegated to the Forest Supervisor. These updates are considered minor corrections that have no bearing on the overall analysis and supplemental NEPA is not required.

## Implementation

Based upon the January 26, 2026, Objection Response Letter, this decision may be signed once all instructions provided by the Reviewing Officer have been addressed. Implementation may occur immediately upon issuance of this signed Decision Notice.

For further information concerning this project, contact Matthew Bullmore, Black Mesa District Ranger, by email at matthew.bullmore@usda.gov, or by phone at 928-535-7300.

JOSHUA MILLER    Digitally signed by JOSHUA MILLER
Date: 2026.01.29 12:21:13 -07'00'

Josh Miller                                                            Date
Acting Forest Supervisor
Apache-Sitgreaves National Forests

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the State or local Agency that administers the program or contact USDA through the Telecommunications Relay Service at 711 (voice and TTY). Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at How to File a Program Discrimination Complaint and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Mail Stop 9410, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov.

USDA is an equal opportunity provider, employer, and lender.

# EXHIBIT 2

**Forest Service**  **Apache-Sitgreaves National Forests**  **30 South Chiricahua Drive**
**Springerville, AZ 85938**

| | | | |
|---|---|---|---|
| **File Code:** | 2200 | **Date:** | March 9, 2026 |
| **Route To:** | | | |

  **Subject:**  Horse Management – Apache-Sitgreaves National Forests

    **To:**  Michiko Martin, Southwestern Regional Forester

The management of the horses on the Apache-Sitgreaves National Forests has been a topic of discussion dating back several years.  Recently, the Forest completed an analysis of a territory management plan for the Heber Wild Horse Territory. This analysis was not intended to and did not make a determination regarding the horses present on the Sitgreaves National Forest. The Wild Free-Roaming Horses and Burros Act of 1971 tasks the responsible official with making the determination of the status of horses present on the Forest based off the information available and to manage accordingly. In 2007 the Forest entered into a stipulation agreement that prohibited the removal of horses from the Sitgreaves National Forest regardless their status. This has resulted in an exponential increase of horses on the Forest since.

Based on the information presented in the record the Heber Wild Horse Territory was established in 1974 from a population of seven unclaimed horses. The record also indicates that the herd consisted of one sterile stud and it was documented that no reproduction was observed within this group of horses between 1969 and 1993. In 1993 correspondence between the District Ranger and Forest Supervisor indicated that the remaining population consisted of two mares. This correspondence also recommended and approved the removal of the remaining horses and the closure of the territory. The 10th and 11th Report to Congress on the Administration of the Wild Free Roaming Horses and Burros Act for Fiscal Years 1992-1995 that was published in 1997 recorded the population of horses as zero, for years 1994 and 1996. In addition to this information, an ethnographic study conducted by Forest Service historians in 2017 also concluded that the horses currently found on the Sitgreaves National Forest are not related to the original horse herd. Therefore, the horses present on the Sitgreaves National Forest are not wild horses nor the progeny of wild horses and  have not intermingled with wild horses as defined by 36 CFR 222.60 (b) (13).

In 2002 the Rodeo-Chediski Fire impacted approximately 54 miles of fenceline along the Forest's boundary with the White Mountain Apache Reservation. The damage to these fences allowed unauthorized livestock unfettered access to the Forest and is the primary source of the horses currently found on the forest. Due to the stipulation agreement livestock owners have been discouraged from removing their property when their horses have gained access to the Forest.

Forest Service regulations at 36 CFR § 222.60 (b)(13), define wild free roaming horses and burros to "mean all unbranded and unclaimed horses and burros and their progeny that have used lands of the National Forest System on or after December 15, 1971, or do hereafter use these



Caring for the Land and Serving People    Printed on Recycled Paper

Michiko Martin, Southwestern Regional Forester                                          2

lands as all or part of their habitat, but does not include any horse or burro introduced onto the National Forest System on or after December 15, 1971, by accident, negligence, or willful disregard of private ownership. I find that the horses currently present on the Sitgreaves were introduced after December 15, 1971, through accident, negligence or willful disregard of ownership and therefore these horses and their progeny are not wild horses

As Acting Forest Supervisor on the Apache-Sitgreaves National Forests, my conclusion is that the unclaimed horses currently found on the Sitgreaves National Forest are "unauthorized livestock" in accordance with Forest Service regulations per 36 CFR 261.2. I have determined that management of the Sitgreaves horses should follow the guidance for unauthorized livestock outlined in the Forest Service directives and regulations and I am encouraging individuals that have a claim to any of these animals to work with the Arizona Department of Agriculture to responsibly reclaim their livestock.

JOSHUA
MILLER

Digitally signed by
JOSHUA MILLER
Date: 2026.03.09 08:18:13
-07'00'

JOSHUA MILLER
Acting Forest Supervisor

cc:  Cecilia Clavet

# EXHIBIT 3

Troy B. Froderman, Esq., SBN 012717
Anthony W. Merrill, Esq., SBN 022598
BRYAN CAVE LLP, #00145700
Two North Central Avenue, Suite 2200
Phoenix, Arizona 85004-4406
E-mail address:  anthony.merrill@bryancave.com
Telephone:  (602) 364-7000
Attorneys for Plaintiffs

Paul K. Charlton
United States Attorney
Richard Patrick
Assistant U.S. Attorney
Two Renaissance Square
40 North Central Avenue, Suite 1200
Phoenix, Arizona  85004-4406
(602) 514-7500
Attorneys for Federal Defendants

## UNITED STATES DISTRICT COURT

### DISTRICT OF ARIZONA

| | |
|---|---|
| IN DEFENSE OF ANIMALS, a non-profit organization; the ANIMAL WELFARE INSTITUTE, a non-profit organization; and the INTERNATIONAL SOCIETY FOR THE PROTECTION OF MUSTANGS and BURROS, a non-profit organization; PATRICIA HAIGHT, an individual; RICHARD POTTS, an individual, | Case No. CV-05-2754- PHX -FJM |
| Plaintiffs, | **STIPULATION AND JOINT MOTION FOR ENTRY OF ORDER ADOPTING STIPULATION AND DISMISSING CLAIMS** |
| vs. | |
| UNITED STATES GOVERNMENT, DEPARTMENT OF AGRICULTURE, MIKE JOHANNS, as acting UNITED STATES SECRETARY OF AGRICULTURE; UNITED STATES FOREST SERVICE; ELAINE J. ZIEROTH, as the acting UNITED STATES FOREST SUPERVISOR, | |

Defendants.

Plaintiffs In Defense of Animals, a non-profit organization, the Animal Welfare Institute, a non-profit organization, the International Society for the Protection of Mustangs and Burros, a non-profit organization, Dr. Patricia Haight, and Richard Potts (collectively "Plaintiffs"), and Defendant United States Government, Department of Agriculture, Mike Johanns as United States Secretary of Agriculture, United States Forest Service, Elaine J. Zieroth, as the United States Forest Supervisor (collectively "Forest Service")[1] hereby STIPULATE and JOINTLY MOVE for entry of an order dismissing the above-captioned action without prejudice on the terms and conditions set forth in this Stipulation.

Plaintiffs commenced Civil Action 05-2754 PHX-FJM against the Forest Service, on September 9, 2005, alleging violations of the Wild Free Roaming Horses and Burros Act of 1971, 16 U.S.C. Section 1331, *et seq.* (the "Act"); the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* ("NEPA"); and the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.* ("APA"), in connection with the issuance of a Solicitation for Bid for the capture, relocation, and eventual sale of approximately 120 trespass horses, from an unknown number of horses residing on public lands.

IT IS STIPULATED by and between the parties as follows:

1.    The Parties agree that settlement of the Civil Action on the conditions stated below is in the public interest and is an appropriate way to resolve the present dispute between them.

2.    The undersigned representatives of Plaintiffs and the Forest Service certify that they are fully authorized by the party or parties whom they represent to enter into this Stipulation and legally bind the Parties to the terms and conditions contained herein.

---

[1] Mike Johanns is substituted for Ann M. Veneman pursuant to Rule 25(d), Fed. R. Civ. P.

3.      The Parties hereby agree that the Heber Wild Horse Territory still exists and has not been dissolved.

4.      The Parties hereby agree that wild horses are by law an integral part and component of the natural system of the public lands, as expressed by Congress in the Wild Free-Roaming Horses and Burros Act of 1971 as amended.  The Forest Service will work with the public, including Plaintiffs, in the development of a written Heber Wild Horse Territory Management Strategy in accordance with the provisions of the Act.

5.      The Forest Service agrees to refrain from any gathering or removing of horses within the Heber Wild Horse Territory, as well as, on the Black Mesa and Lakeside Ranger Districts (which are considered the Sitgreaves National Forest) until the Forest Service completes, with public involvement, an analysis and appropriate environmental document pursuant to NEPA and develops a written Heber Wild Horse Territory Management Strategy.  The Forest Service will involve the public, including the Plaintiffs, in scoping for this analysis.  The Forest Service will provide Plaintiffs with specific notice of the document and consider Plaintiffs' comments on the same, however, Plaintiffs' comments are not entitled to any different weight or consideration than any other member of the public.

6.      The Forest Service will continue to coordinate with the White Mountain Apache Tribe for repair and maintenance of the boundary fence.

7.      Plaintiffs reserve the right to object to any provision, term, or condition contained in the Management Strategy and/or the results of any study, assessment, or evaluation used to support the Management Strategy.  Nothing in this Stipulation shall bar Plaintiffs from filing a new civil action in the future should there be a dispute involving this Stipulation, the NEPA process or final NEPA document, and/or the Management Strategy.

8.      Upon approval of this Stipulation and granting of this Joint Motion by the Court, all counts of Plaintiffs' Complaint in Civil Action 05-2754 PHX-FJM shall be dismissed without prejudice and parties will agree to vacate the injunction.

9.   Upon dismissal of this civil action, the Forest Service will pay the Plaintiffs a total of $3,000.00 in full and complete satisfaction of any and all claims for attorneys' fees and costs of litigation by Plaintiffs for pursing Civil Action 05-2754 PHX-FJM.

10.   Plaintiffs agree that receipt of this payment from the Forest Service shall operate as a release of any and all claims for attorneys' fees and costs that Plaintiffs may seek to pursue in Civil Action 05-2754-PHX-FJM.

11.   The Parties agree and understand that the Forest Service's obligations under this Stipulated Settlement Agreement, with exception of those listed in Paragraph 10, are contingent upon the availability of appropriate funds, and that nothing in this Agreement shall be construed as a commitment or requirement that the Forest Service obligate or pay funds in contravention of the Anti-Deficiency Act, 31 U.S.C. § 1341, or other applicable law.

12.   Nothing in this Stipulation and Joint Motion constitutes an admission by any Party to any fact, claim, or defense at issue in this lawsuit.

DATED:  this 13th day of March, 2007.

s/ Paul K. Charlton
PAUL K. CHARLTON
United States Attorney

s/ Richard Patrick
RICHARD PATRICK
Assistant U.S. Attorney
Two Renaissance Square
40 North Central Avenue, Suite 1200
Phoenix, Arizona 85004-4406
(602) 514-7500

Attorneys for Federal Defendants

s/ Anthony W. Merrill
ANTHONY W. MERRILL, ESQ.
BRYAN CAVE LLP
Two North Central Avenue, Suite 2200
Phoenix, Arizona 85004-4406
(602) 364-7000

Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

|  |  |
|---|---|
| IN DEFENSE OF ANIMALS, a non-profit organization; the ANIMAL WELFARE INSTITUTE, a non-profit organization; and the INTERNATIONAL SOCIETY FOR THE PROTECTION OF MUSTANGS and BURROS, a non-profit organization; PATRICIA HAIGHT, an individual; RICHARD POTTS, an individual,<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED STATES GOVERNMENT, DEPARTMENT OF AGRICULTURE, MIKE JOHANNS, as acting UNITED STATES SECRETARY OF AGRICULTURE; UNITED STATES FOREST SERVICE; ELAINE J. ZIEROTH, as the acting UNITED STATES FOREST SUPERVISOR,<br><br>Defendants. | CIV-05-2754-PCT-FJM<br><br>**ORDER** |

Pursuant to the parties stipulation and Joint Motion (doc. 54) and for good cause appearing,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

- Adopting the terms set forth in the parties' Stipulation and Joint Motion for Entry of Order;

- Dismissing the above-captioned litigation without prejudice; and

- Vacating the preliminary injunction entered on December 13, 2005.

DATED this 21st day of March, 2007.

Frederick J. Martone
United States District Judge

# EXHIBIT 4



# Notice
## OF INTENT TO IMPOUND UNAUTHORIZED LIVESTOCK
### (Ref. FSM 5330)

Notice is hereby given that pursuant to Regulation of the Secretary of Agriculture, 36 C.F.R. 262.10, all unauthorized livestock found upon National Forest System Lands or other lands under Forest Service control within the following area may be impounded by the United States Forest Service on or after April 27, 2026 (date), unless said livestock are removed permanently from the described lands.

| TOPOGRAPHIC UNIT, LEGAL SUBDIVISION OR ALLOTMENT | RANGER DISTRICT |
|---|---|
| District wide on the following Ranger Districts: Black Mesa Ranger District and Lakeside Ranger District | Black Mesa & Lakeside |
| NATIONAL FOREST OR GRASSLAND | STATE |
| Apache-Sitgreaves National Forests | Arizona |

The livestock are described as follows:

Any unbranded livestock, or any livestock bearing brands of previously unauthorized livestock which are found to be making continuing or subsequent unauthorized use within twelve months after publication of this notice may be impounded without further notice.

After the impoundment, owners of unauthorized livestock may regain possession thereof only by first showing proof of ownership and reimbursing the United States in full for the expense incurred in impounding, feeding, and care of such livestock, or if impoundment costs exceed fair market value, by a payment equal to the fair market value of the impounded livestock. All impounded animals not redeemed within 5 days after notice of sale of impounded livestock has been published in a local newspaper, posted in the county courthouse and in one or more local post offices, will be offered for sale at public auction.

Livestock not sold at public sale may be sold at private sale or condemned and destroyed or otherwise disposed of as provided by Regulation 36 C.F.R. 262.10(f).

Signed at Springerville, AZ _____ this 2nd day of April, 2026

| SIGNATURE OF AUTHORIZED OFFICER | NAME (PRINT) | TITLE |
|---|---|---|
| JOSHUA MILLER  Digitally signed by JOSHUA MILLER Date: 2026.04.02 14:46:26 -07'00' | Joshua Miller | Apache-Sitgreaves Acting Forest Supervisor |

# EXHIBIT 5

Troy B. Froderman (012717)
Rita M. Gara (037349)
FR LAW GROUP PLLC
4745 North 7th Street, Suite 210
Phoenix, AZ 85014
602-566-7425
tfroderman@frlawgroup.com
rgara@frlawgroup.com

Randall M. Weiner (CO Bar No. 23871)
Annmarie Cording (CO Bar No. 42524)
WEINER & CORDING
3100 Arapahoe Avenue, Suite 202
Boulder, Colorado 80303
(303) 440-3321
randall@randallweiner.com
annmarie@weinercording.com
*Admitted Pro Hac Vice*

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Salt River Wild Horse Management Group, | Case No. 3:24-cv-08148-JJT |
| Plaintiff, | |
| vs. | **DECLARATION OF CHRISTIAN FELLHOELTER** |
| U.S. Department of Agriculture, et al., | |
| Defendants. | |

I, Christian Fellhoelter, hereby declare as follows:

1.    I submit this declaration in support of the Salt River Wild Horse Management Group's (SRWHMG) Request for a Temporary Restraining Order. The facts stated herein

1

are personally known to me. If called as a witness, I will and can competently testify thereto.

2.    My wife, Laura, and I own a cabin in the Heber-Overgaard and enjoy watching the wild horses in the Apache-Sitgreaves National Forest (the "Forest") daily. Our cabin is in the Black Mesa Ranger District.

3.    I recently became aware that a notice of impound for "unauthorized livestock" was signed by Joshua Miller, Acting Supervisor of the Forest to round up wild horses in the Forest, dated April 2, 2026 (the "Impound Notice"). The Impound Notice was publicly released on April 6, 2026. The Impound Notice states that such unauthorized livestock impoundment will occur in the Black Mesa and Lakeside Ranger District "on or after April 27, 2026."

4.    However, the impoundment began on April 21, 2026, one week early. Two of Defendant Rail Lazy H's contractors, Frank Despain and Larry Nelson, working for Nelson Churley of Black Canyon Cattle, ran several Wild Horses into a holding corral off Forest Service Road 51 and then loaded them into a trailer and drove off with the Wild Horses.

5.    Additional horses were impounded today, April 22.

6.    Just as concerning are the primitive and cruel type of "holding corrals" that are being used for the impound. I'm attaching pictures I took of these holding corral on March 28, 2026, showing barbed wire and protruding tie wire in the fencing. **Exhibit 1**.

7.    These holding corrals violate the Comprehensive Animal Welfare Program (CAWP), which Defendant USFS agreed to abide by for "all operations which involve handling of horses." **Exhibit 2**. Under the CAWP, the holding corrals cannot have "holes, gaps or openings, protruding surfaces, or sharp edges," should have "rounded corners," and

2

must contain "enough pens to sort horses according to gender, age, number, temperament, or physical condition." **Exhibit 3**.

8.      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 22nd day of April, 2026 in Heber, AZ.

Christian Fellhoelter

3

Exhibit 1



"There must be no holes, gaps or openings, protruding surfaces, or sharp edges present in fence panels or other structures that may cause escape or possible injury." Exhibit 5 at 1.

Exhibit 1



"There must be no holes, gaps or openings, protruding surfaces, or sharp edges present in fence panels or other structures that may cause escape or possible injury." Exhibit 5 at 1.

Exhibit 1



"The design of pens at the trap site and temporary holding factility should be constructed with rounded corners." Exhibit 5 at 2

"There must be no holes, gaps or openings, protruding surfaces, or sharp edges present in fence panels or other structures that may cause escape or possible injury." Exhibit 5 at 1.

Exhibit 1



"There must be no holes, gaps or openings, protruding surfaces, or sharp edges present in fence panels or other structures that may cause escape or possible injury." Exhibit 5 at 1.

Exhibit 1



"There must be no holes, gaps or openings, protruding surfaces, or sharp edges present in fence panels or other structures that may cause escape or possible injury." Exhibit 5 at 1.

Exhibit 1



"There must be no holes, gaps or openings, protruding surfaces, or sharp edges present in fence panels or other structures that may cause escape or possible injury." Exhibit 5 at 1.

Exhibit 1



"There must be no holes, gaps or openings, protruding surfaces, or sharp edges present in fence panels or other structures that may cause escape or possible injury." Exhibit 5 at 1.

Exhibit 1



"There must be no holes, gaps or openings, protruding surfaces, or sharp edges present in fence panels or other structures that may cause escape or possible injury." Exhibit 5 at 1.

Exhibit 2


**United States Department of Agriculture**

# Heber Wild Horse Territory Final Management Plan




**Forest Service**      **Apache-Sitgreaves National Forests**      **Black Mesa Ranger District**
**July 2025**

# Exhibit 2

*Heber Wild Horse Territory Final Management Plan*

| Number | Objective | Design Criteria or Best Management Practices | Responsible Party |
|---|---|---|---|
| Rec-2 | Protect recreation opportunities | When constructing temporary traps or handling corrals, the recreation opportunity spectrum and site management guidelines apply. (https://www.fs.usda.gov/sites/default/files/fs_media/fs_document/ros-guide.pdf). | District recreation staff |
| Horse-1 | Horse health and welfare | All operations which involve handling of horses will be conducted in accordance with the Comprehensive Animal Welfare Program found in the territory management plan. | Forest Service range or horse program manager |
| Horse-2 | Horse contraceptive application | The application of contraceptives will be overseen by the Forest Pesticide Use Coordinator (PUC)[5], which must be licensed through the State. | Forest Service range or horse program manager |
| Horse-3 | Horse contraceptive application | Contraceptive use proposals (FS-2100-0002) must be submitted to the PUC and approved by the Forest Supervisor. | Forest Service range or horse program manager |
| Horse-4 | Horse contraceptive application | Contraceptives would be administered only by trained Forest Service personnel or collaborating partners in accordance with both Federal and State laws. | Forest Service range or horse program manager |
| Horse-5 | Horse contraceptive application[6] | Delivery of the contraceptives would be by intramuscular injection into the manufacturers approved site of delivery (deep gluteal or cervical musculature). In the future, contraceptives may be administered remotely using an approved long-range darting protocol and remote delivery system (RDS) if or when that technology is developed. | Forest Service range or horse program manager |
| Horse-6 | Horse contraceptive application | All treated mares would be identified and documented. | Forest Service range or horse program manager |
| Horse-7 | Horse contraceptive application | A data sheet would be used by field staff to record all pertinent data (the type and quantity of immunocontraception product issued, including any adverse reactions or personnel incidents; disposition of any unused product; the number of treated mares by collaborating groups or Forest Service personnel, along with any type of identification applied, date) and stored in Natural Resource Manager (NRM) database. An application report would be available through NRM for the Regional and Washington Office if needed. | Forest Service range or horse program manager |

---

[5] The pesticide use coordinator (PUC) is an individual designated by the Forest to ensure proposals comply with NEPA, the territory management plan, and that individuals carrying out the proposal have the correct certifications and training required by Federal and State laws.
[6] These same procedures may be used for vaccines as well as contraceptives.

Exhibit 3

*Heber Wild Horse Territory Final Management Plan*

# Appendix 2: Comprehensive Animal Welfare Standards

Excess animals may be transported to a Bureau of Land Management or Forest Service facility where they would be cared for in accordance with the Wild Free-Roaming Horses and Burros Act and the most current Forest Service regulations and policies (prepared [freeze-marked or micro-chipped, vaccinated and de-wormed] for adoption or long-term holding).

## Facility Design

### Trap Sites, Handling Corrals, and Holding Facility

- The trap site and holding facility must be constructed of stout materials and be maintained in proper working condition, including gates that swing freely and latch or tie easily.

- Trap sites should be located close to horse locations whenever possible to minimize the distance animals need to travel.

- If jute is hung on the fence posts of an existing wire fence in the trap wing, the wire must either be rolled up and removed or let down and bundled together into a cable at ground level for the entire length of the jute in such a way that minimizes possibility of entanglement by horses.

- Fence panels in pens and alleys must be not less than 6 feet high for horses and the bottom rail must not be more than 12 inches from ground level.

- Temporary holding facilities must have enough pens available to sort horses according to gender, age, number, temperament, or physical condition.

    ♦ All pens must be assembled with capability for expansion.

    ♦ Alternate pens must be made available for the following:

        ▪ horses that are weak or debilitated

        ▪ mares with dependent foals

    ♦ Horses in pens at the temporary holding facility should be maintained at a proper stocking density to allow, when at rest, all horses to occupy no more than half the pen area.

- An appropriate chute designed for restraining horses must be available for necessary procedures at the temporary holding facility. This does not apply to bait-trapping operations unless directed.

- There must be no holes, gaps or openings, protruding surfaces, or sharp edges present in fence panels or other structures that may cause escape or possible injury.

- Padding must be installed on the overhead bars of all gates and chutes used in single-file alleys.

- Finger gates (one-way funnel gates) used in bait trapping must be constructed of approved materials approved. Finger gates must not be constructed of materials which have sharp ends that may cause injuries to horses, such as "T" posts, sharpened willows, etc.

- Water must be provided at a minimum rate of ten gallons per 1,000-pound animal per day, adjusted accordingly for larger or smaller horses, foals, and environmental conditions, with each trough placed in a separate location of the pen (troughs at opposite ends of the pen). Water must be refilled at least every 12 hours.

Exhibit 3

*Heber Wild Horse Territory Final Management Plan*

- The design of pens at the trap site and temporary holding facility should be constructed with rounded corners.

- All gates and panels in the animal holding and handling pens and alleys of the trap site must be covered with materials such as plywood, snow fence, tarps, burlap, etc. approximately 48 inches in height to provide a visual barrier for the animals. All materials must be secured in place. These guidelines apply:

  ♦ For exterior fences, material covering panels and gates must extend from the top of the panel or gate toward the ground.

  ♦ For alleys and small internal handling pens, material covering panels and gates should extend from no more than 12 inches below the top of the panel or gate toward the ground to facilitate visibility of animals and the use of flags and paddles during sorting.

  ♦ The initial capture pen may be left uncovered as necessary to encourage animals to enter the first pen of the trap.

- Nonessential personnel and equipment must be located to minimize disturbance of horses.

- Trash, debris, and reflective or noisy objects should be eliminated from the trap site and temporary holding facility.

## Loading and Unloading Areas

- Facilities in areas for loading and unloading horses at the trap site or temporary holding facility must be maintained in a safe and proper working condition, including gates which swing freely and latch or tie easily.

- The side panels of the loading chute must be a minimum of 6 feet high and fully covered with materials such as plywood or metal without holes which may cause injury.

- There must be no holes, gaps or openings, protruding surfaces, or sharp edges present in fence panels or other structures which may cause escape or possible injury.

- All gates and doors must open and close easily and latch securely.

- Loading and unloading ramps must have a non-slip surface and be maintained in a safe and proper working condition to prevent slips and falls. Examples of non-slip flooring would include, but not be limited to, rubber mats, sand, shavings, and steel reinforcement rods built into ramps. There must be no holes in the flooring or items that can cause an animal to trip.

- Trailers must be properly aligned with loading and unloading chutes and panels ensuring no gaps exist between the chute or panel and floor or sides of the trailer creating a situation where a horse could injure itself.

- Stock trailers should be positioned for loading or unloading to allow no more than 18 inches clearance between the ground and floor of the trailer for horses.

## Transportation

- Only covered stock trailers in sound mechanical condition will be permitted to transport horses. Trailers must have sufficient interior height to allow each equine to stand with its head extended to the fullest normal postural height.

- Side-by-side trailers will not be authorized.

Exhibit 3

*Heber Wild Horse Territory Final Management Plan*

- Horses will be separated by sex when loaded. Stallions and any aggressive equines are completely segregated so no stallion can come into contact with any other horse on the conveyance. Each horse has enough floor space to ensure no equine is crowded in a way likely to cause injury or discomfort.

- All trailers will be single level and no "pot-belly" trailers are authorized to transport horses.

- Flooring of all transport trailers should not be slick or slippery, if metal, it should be covered with rubber matting to allow for secure footing and minimize slips and falls.

- All personnel driving transport trailers will have been properly trained in driving trailers with live animals.

- Adequate space to prevent overcrowding will be provided following American Veterinary Medical Association humane care and USDA Animal Care guidelines for horses when horses are loaded for transport.

## Care

### Feeding and watering

- Adult horses held in traps or temporary holding pens for longer than 12 hours must always be fed and watered at approximately 12-hour intervals with water available other than when animals are being sorted or worked.

- Water must be provided at a minimum rate of ten gallons per 1,000-pound animal per day, adjusted accordingly for larger or smaller horses, and foals, and environmental conditions, with each trough placed in a separate location of the pen (troughs at opposite ends of the pen). Water must be refilled at least every 12 hours.

- In all holding and working facilities the best hay possible will be used. Hay should be inspected prior to purchase to reduce the amount of weeds present. A weed monitoring and abatement plan will be implemented for each site.

- Hay must be fed at a minimum rate of 20 pounds per 1,000-pound adult animal per day, adjusted accordingly for larger or smaller horses, burros, and foals. Hay placement must allow all horses to eat simultaneously.

- When water or feed deprivation conditions exist on the range prior to the gather, the Apache-Sitgreaves National Forests horse staff should adjust the watering and feeding arrangements in consultation with the on call veterinarian as necessary to provide for the needs of the animals.

### Dust abatement

- Dust abatement by spraying the ground with water may be employed when necessary at the trap site and temporary holding facility.

### Trap site

- Dependent foals or weak or debilitated animals must be separated from other horses at the trap site to avoid injuries during transportation to the temporary holding facility. Separation of dependent foals from mares must not exceed four hours unless the immediate decision is made to wean the foals.

### Holding facility

- All horses in confinement must be observed at least once daily to identify sick or injured horses and ensure adequate food and water.

Exhibit 3

*Heber Wild Horse Territory Final Management Plan*

- Dependent foals must be reunited with their mares at the temporary holding facility within four hours of capture unless foals are old enough to be weaned during the gather.

- Non-ambulatory horses must be in a pen separate from the general population and must be examined by the Apache-Sitgreaves National Forests horse staff, the on-call or on-site veterinarian, or both as soon as possible, no more than four hours after recumbency is observed. Water and hay must be accessible to the recumbent horses within 12 hours or sooner at the discretion of the Apache-Sitgreaves National Forests horse staff.

- Alternate pens must be made available for the following:

    ♦ horses that are weak or debilitated

    ♦ mares with dependent foals

- Aggressive horses causing serious injury to other animals should be identified and relocated into alternate pens when possible.

- Horses in pens at the temporary holding facility should be maintained at a proper stocking density such that, when at rest, all horses occupy no more than half the pen area.

## Biosecurity

Health records for all saddle and pilot horses used on horse gathers must be provided to the Apache-Sitgreaves National Forests horse staff prior to joining a gather, including:

- Certificate of veterinary inspection (health certificate, within 30 days).

- Proof of:

    ♦ a negative test for equine infectious anemia (Coggins or enzyme-linked immunosorbent assay [EIA or ELISA] test) within 12 months.

    ♦ vaccination for tetanus, eastern and western equine encephalomyelitis, West Nile virus, equine herpes virus, equine influenza, and rabies within 12 months.

# Handling

## General Handling

- All sorting, loading, or unloading of horses during gathers must be performed during daylight hours except when unforeseen circumstances develop, and the Apache-Sitgreaves National Forests horse staff approves the use of supplemental light.

- Horses should be handled to enter runways or chutes in a forward direction.

- Horses should not remain in single-file alleyways, runways, or chutes longer than 30 minutes.

- No equipment should be operated in such a manner as to cause flighty behavior by or injury to horses.

## Willful Acts of Abuse

- Hitting, kicking, striking, or beating any horse in an abusive manner is prohibited.

- Dragging a recumbent horse without a sled, slide board or slip sheet is prohibited. Ropes used for moving the recumbent animal must be attached to the sled, slide board, or slip sheet.

- There should be no deliberate driving of horses into other animals, closed gates, panels, or other equipment.

Exhibit 3

*Heber Wild Horse Territory Final Management Plan*

- There should be no deliberate slamming of gates and doors on horses.

- There should be no excessive noise (for example, constant yelling) or sudden activity causing horses to become unnecessarily flighty, disturbed, or agitated.

## Handling Aids

- Handling aids such as flags and shaker paddles must be the primary tools for driving and moving horses during handling and transport procedures. Contact of the flag or paddle end of primary handling aids with a horse is allowed. Ropes looped around the hindquarters may be used from horseback or on foot to assist in moving an animal forward or during loading.

- Electric prods must not be used routinely as a driving aid or handling tool. Electric prods may be used in limited circumstances only if the following guidelines are followed:

  - Electric prods must only be a commercially available make and model that uses DC battery power, and batteries should always be fully charged.

  - The electric prod device must never be disguised or concealed.

  - Electric prods must only be used after three attempts using other handling aids (flag, shaker paddle, and voice or body position) have been tried unsuccessfully to move the horses.

  - Electric prods must only be picked up when intended to deliver a stimulus; these devices must not be constantly carried by the handlers.

  - Space in front of an animal must be available to move the horse forward prior to application of the electric prod.

  - Electric prods must never be applied to the face, genitals, anus, or underside of the tail of a horse.

  - Electric prods must not be applied to any one horse more than three times during a procedure (for example, sorting or loading) except in extreme cases with approval of the Apache-Sitgreaves horse staff. Each exception must be approved at the time by the Apache-Sitgreaves horse staff.

  - Any electric prod use that may be necessary must be documented daily by the Apache-Sitgreaves National Forests horse staff including time of day, circumstances, handler, location (trap site or temporary holding facility), and any injuries (to horse or human).

# EXHIBIT 6

🇺🇸 An official website of the United States government    Here's how you know



**U.S. DEPARTMENT OF THE INTERIOR**

**BUREAU OF LAND MANAGEMENT**

  

| Home | Visit | About | Learn | Services | Get Involved | Programs | Info | States | Contact Us | **Fire Restrictions** |



Home > Programs > Wild Horse and Burro > About the Program > Comprehensive Animal Welfare Program

# Comprehensive Animal Welfare Program

About the Program

About Wild Horses and Burros

**Comprehensive Animal Welfare Program**

The Bureau of Land Management's Comprehensive Animal Welfare Program is a proactive program for protecting the welfare of wild horses and burros under the agency's management and protection. The BLM is committed to protecting animal welfare and providing humane care and treatment to all wild horses and burros protected by the Wild Free-Roaming Horses and Burros Act.

The CAWP formalizes standard operating procedures surrounding animal care and handling; establishes formal training programs in animal welfare for BLM personnel, partners and contractors; and implements internal and external assessments for all activities undertaken in the Wild Horse and Burro Program. The program areas covered under the CAWP are:

- On the Range

- During Gathers

- Off-Range Corrals, Transportation, and Adoption/Sale Events

- Off-Range Pastures

- Following Placement into Private Care

# What is "Comprehensive"?

Frequently Asked Questions

Program History

Educational Resources

Myths and Facts

Common Questions from the Public

Program Data

Program Maps                    +



Comprehensive means the standards for humane handling and compassionate care apply to all management activities undertaken by BLM staff, partners, contractors and volunteers. This includes activities on public lands, in BLM and contracted facilities, and during transportation. Comprehensive also describes the program's approach, which includes establishing standards, providing training, collecting data, assessing results and recommending changes.

# What is "Animal Welfare"?



Animal welfare is the physical and psychological well-being of animals and how they are coping with their environments. Animal welfare science considers three aspects of the animal's physical and psychological state: body, behavior and mind. The body includes heath and function, nutrition, growth freedom from injury and disease. The mind includes emotional states, pleasure, suffering and fear. The behavior includes innate and learned characteristics and behaviors, and needs of being a horse or burro.

# Program Components

The BLM's Comprehensive Animal Welfare Program includes four elements:

1. Develop the animal welfare standards. Standards have been developed and are in place for gathers and off-range corrals, transportation and adoption/sale events. Standards are under development or planned to be developed for on the range, off-range pastures and following placement into private care.

2. Train BLM staff, contractors and partners on the standards.

3. Conduct animal welfare assessment using the assessment tool or checklist.

4. Document, share and learn from the animal welfare assessment results to make program improvements where warranted.

[Access Permanent Instruction Memorandum 2021-002: Wild Horse and Burro Comprehensive Animal Welfare Program](#)

[Access Instruction Memorandum 2023-041: Wild Horse and Burro Comprehensive Animal Welfare Program Standards for Off-Range Pastures (ORPs) and Public Off-Range Pastures (PORPs)](#)

# CAWP Internal Assessments

The BLM CAWP Team completes periodic internal assessments of CAWP compliance for all operational activities in the Wild Horse and Burro Program. Reports are generally made available to the public seven business days after the report is finalized by the CAWP Team.

For more information, download the BLM's [Comprehensive Animal Welfare Program Fact Sheet](#)

**During Gathers**

**Off-Range Corrals, Transportation and Adoption/Sale Events**

Case 3:24-cv-08148-JJT    Document 64-11    Filed 04/23/26    Page 70 of 102

# Was this page helpful?

⭕ Yes

⭕ No

[Privacy Notice](#)

🇺🇸 An official form of the United States government. Provided by [Touchpoints](#)

U.S. DEPARTMENT OF THE INTERIOR
**BUREAU OF LAND MANAGEMENT**



   

About BLM

Careers

Contact Us

Maps

Information Center

Website Disclaimers

Feedback

Report Misconduct

Office of Civil Rights

blm.gov

**An official website of the Department of the Interior**

About DOI.gov

Accessibility statement

FOIA requests

No FEAR Act data

Office of the Inspector General

Budget & performance reports

Agency financial reports

Disclaimer

Privacy policy

Vulnerability disclosure policy

Cummings Act notices

Looking for U.S. government information and services?  **Visit USA.gov**

Case 3:24-cv-08148-JJT    Document 64-11    Filed 04/23/26    Page 72 of 102    4/23/26, 1:18 PM



🇺🇸 An official website of the United States government    Here's how you know

**U.S. DEPARTMENT OF THE INTERIOR**

**BUREAU OF LAND MANAGEMENT**

Blm Search

**Home**    **Visit**    **About**    **Learn**    **Services**    **Get Involved**    **Programs**    **Info**    **States**    **Contact Us**    **Fire Restrictions**

Home > Info > Our Stories

You are viewing **ARCHIVED** content published online before January 20, 2025. Please note that this content is **NOT UPDATED**, and links may not work. Additionally, any previously issued diversity, equity, inclusion or gender-related guidance on this webpage should be considered rescinded. For current information, visit https://www.blm.gov/blog.

< All BLM Blogs

# Top 5 things to know about the Wild Horse and

## Related Content

[Back to Tales from the Trail blog](#)

## Related Stories

April 21, 2026

[A Legacy in the Saddle: Three Riders, One Wild Beginning](#)

April 16, 2026

[BLM Officers Stand Alone in Grueling U.S. Customs and Border Protection Horseback](#)

# Burro Program

Jan 12, 2022

The [1971 Wild Free-Roaming Horses and Burros Act](#) directs the Bureau of Land Management (and U.S. Forest Service) to manage and protect wild horses and burros on public lands where they existed at the time the Act was passed. The Act also directs that wild horses and burros are to be managed at appropriate levels to support a thriving natural ecological balance and multiple-use relationship on public lands.

To achieve the vision of the 1971 Act, the BLM created the [Wild Horse and Burro Program](#) with the goal of managing healthy wild horses and burros on healthy public lands. However, achieving this goal is not as straight-forward or simple as it seems. To help make it easier to understand, here are the top 5 things to know the Wild Horse and Burro Program ([and check out the infographic at the bottom of this post](#)    !):

## 1. Wild horses and burros are an integral part of the natural system of the public lands.

The 1971 Act and subsequent legislation places wild horses and burros among the many authorized uses of America's system of public lands. Similar to other uses of public lands like [wildlife habitat](#), [livestock grazing](#) and [recreation](#), wild horse and burro populations are managed so as to maintain

Course

March 6, 2026

[Let's talk about Mustang Camp](#)

March 5, 2026

[BLM Eastern States showcases wild horses at Dixie National Parade](#)

February 12, 2026

[Wild horse and burro adoptions and sales climbed in Fiscal Year 2025, reducing long-term care costs](#)

a healthy balance and sustainable use of public lands.



Wild burros graze alongside pronghorn on BLM-managed public lands.

## 2. Wild horses have adapted well to the American West.

With few predators capable of naturally controlling herd size, a herd of wild horses typically doubles in size every four years if not managed (with a similar, slightly slower rate for burros). This rapid growth rate can quickly lead to overpopulation in a desert ecosystem. Find the latest data on wild horse and burro populations roaming BLM-managed public lands.



**Wild horses in the Salt Wells Creek Herd Management Area of Wyoming.**

# 3. Overpopulated herds threaten land and herd health.

When a herd is overpopulated, it raises the risk of starvation and thirst for wild horses, wild burros and other wildlife. Overgrazing by horses leads to invasive and less nutritious weeds like cheatgrass, and fewer native plants. Horses and burros are also put at risk of injury and death on highways and private property as they wander larger areas in search of food and water.

**A group of wild horses attempt to drink enough water in the Pine Nut Mountains Herd Management Area in Nevada.**

## 4. BLM has a plan.

The BLM uses multiple humane, non-lethal tools to maintain balance and support healthy herds of wild horses and burros on healthy public lands. Specialized fertility control technology can help safely slow growth in some herds through contraception while keeping animals on the range. When herds become overpopulated, excess animals are carefully gathered, relocated and prepared for the next step of their journey.

A gathered wild horse is sorted at temporary holding in Nevada.

# 5. You can adopt a wild horse or burro.

The BLM cares for and makes excess wild horses and burros available for adoption by qualified individuals or organizations. Adopted wild horses and burros can be trained and have gone on to excel in a variety of disciplines , from becoming award-winning show horses to being recognized as prized work horses and trail-riding buddies. Unadopted wild horses are transported to large off-range pastures where they can live the rest of their lives grazing in open space.

By placing animals into private care, the BLM can continue to operate its unique management strategy for wild horses and burros that uses nonlethal tools to control population growth and promote good habitat health for all.

[Download the Wild Horse and Burro Program Infographic (PDF)](#)  .

**Blog Topic:** Wild Horse and Burro

# Was this page helpful?

◯ Yes

◯ No

[Privacy Notice](#)

🇺🇸 An official form of the United States government. Provided by [Touchpoints](#)



U.S. DEPARTMENT OF THE INTERIOR

**BUREAU OF LAND MANAGEMENT**

About BLM

Careers

Contact Us

Maps

Information Center

Website Disclaimers

Feedback

Report Misconduct

Office of Civil Rights

   

Case 3:24-cv-08148-JJT    Document 64-11    Filed 04/23/26    Page 80 of 102

blm.gov

**An official website of the Department of the Interior**

About DOI.gov

Accessibility statement

FOIA requests

No FEAR Act data

Office of the Inspector General

Budget & performance reports

Agency financial reports

Disclaimer

Privacy policy

Vulnerability disclosure policy

Cummings Act notices

Looking for U.S. government information and services?  **Visit USA.gov**



🇺🇸 An official website of the United States government   Here's how you know

**U.S. DEPARTMENT OF THE INTERIOR**

**BUREAU OF LAND MANAGEMENT**

**Home**     **Visit**     **About**     **Learn**     **Services**     **Get Involved**     **Programs**     **Info**     **States**     **Contact Us**     **Fire Restrictions**

Home > Info > Our Stories

## < All BLM Blogs

# Top 5 things to know about the Comprehensive Animal Welfare Program

May 1, 2025

Wild horses and burros are among the most iconic species

### Related Content

[Top 5 Things to Know About the Wild Horse and Burro Program](#)

[Top 5 Things to Know About Wild Horse and Burro Fertility Control](#)

[Top 5 Things to Know About Wild Horse and Burro Gathers](#)

[Top 5 Things to Know About Adopting or Purchasing a Wild Horse or Burro](#)

Case 3:24-cv-08148-JJT    Document 64-11    Filed 04/23/26    Page 82 of 102

roaming the American landscape so ensuring their well-being requires more than just basic care – it demands a comprehensive, thoughtful and science-driven approach. The Bureau of Land Management's Comprehensive Animal Welfare Program was developed to ensure these cherished animals receive the best possible care throughout their entire journey, from gather to adoption.

Here are the top five things you need to know about the Comprehensive Animal Welfare Program and how it works to protect the health and safety of wild horses and burros under BLM care:

# 1. The Comprehensive Animal Welfare Program formalizes humane care, handling and treatment practices.

The program brings together long-standing practices for the humane treatment of wild horses and burros into a single, consistent framework. By consolidating standard operating procedures into one comprehensive program, the Comprehensive Animal Welfare Program promotes consistency and accountability across all wild horse and burro operations.

WATCH: The Comprehensive Animal Welfare Program on Facebook Reels

# 2. External experts helped shape the program's standards.

The BLM worked with veterinarians and partnered with animal welfare experts from the School of Veterinary

## Related Stories

April 21, 2026

A Legacy in the Saddle: Three Riders, One Wild Beginning

April 16, 2026

BLM Officers Stand Alone in Grueling U.S. Customs and Border Protection Horseback Course

March 6, 2026

Let's talk about Mustang Camp

March 5, 2026

BLM Eastern States showcases wild horses at Dixie National Parade

February 12, 2026

Wild horse and burro adoptions and sales climbed in Fiscal Year 2025, reducing long-term care costs

Case 3:24-cv-08148-JJT    Document 64-11    Filed 04/23/26    Page 83 of 102

Medicine at the University of California, Davis to develop the program's science-based standards. The BLM's deep experience with the unique circumstances of handling wild horses and burros was also instrumental.



BLM staff handling wild burros at an adoption event.

## 3. Training is required for everyone involved.

All BLM employees, contractors, partners and volunteers who interact with wild horses and burros must complete animal welfare training, typically on an annual basis. This ensures everyone is equipped to meet the program's high standards for animal care.

Case 3:24-cv-08148-JJT    Document 64-11    Filed 04/23/26    Page 84 of 102



BLM employees receive training and guidance in Comprehensive Animal Welfare Program assessments at the Burns Off-Range Corrals in Oregon.

# 4. Assessments ensure compliance and drive improvements.

Formal assessments are conducted at gathers, adoption events, and off-range facilities by rotating teams of interdisciplinary subject matter experts. These audits help the BLM track compliance and identify opportunities to strengthen operations.

Case 3:24-cv-08148-JJT    Document 64-11    Filed 04/23/26    Page 85 of 102



BLM employee assessing unloading of wild horse at an adoption event.

# 5. The program evolves based on data and feedback.

The Comprehensive Animal Welfare Program is not static. Data collected from assessments are used to refine and improve various elements of the Wild Horse and Burro Program to ensure first-class care for America's living legends.



A healthy gardin at a BLM corral

A healthy yearling at a BLM corral.

The Comprehensive Animal Welfare Program is central to the BLM's mission of protecting and managing wild horses and burros. With science, training, and compassion at its core, the Comprehensive Animal Welfare Program ensures these iconic animals are treated with the dignity and respect they deserve.

**Story by:** *Jason Lutterman, Public Affairs Specialist*

**Blog Topic:** Wild Horse and Burro

## Was this page helpful?

⭕ Yes

⭕ No

Privacy Notice

🇺🇸  An official form of the United States government. Provided by Touchpoints



U.S. DEPARTMENT OF THE INTERIOR
**BUREAU OF LAND MANAGEMENT**

About BLM

Careers

Contact Us

   

**Maps**

**Information Center**

**Website Disclaimers**

**Feedback**

**Report Misconduct**

**Office of Civil Rights**

blm.gov

**An official website of the Department of the Interior**

About DOI.gov

Accessibility statement

FOIA requests

No FEAR Act data

Office of the Inspector General

Budget & performance reports

Agency financial reports

Disclaimer

Privacy policy

Vulnerability disclosure policy

Cummings Act notices

Looking for U.S. government information and services?  **Visit USA.gov**

# EXHIBIT 7

# COMPREHENSIVE ANIMAL WELFARE PROGRAM

# STANDARDS

# OFF-RANGE PASTURES



Developed by

The Bureau of Land Management
Wild Horse and Burro Program

August 1, 2022

IM 2023-041, Attachment 1

Table of Contents

I.    PASTURE PERSONNEL................................................................................................3

    A.    General........................................................................................................................3

II.    OFF-RANGE PASTURE DESIGN.............................................................................3

    A.    General........................................................................................................................3

    B.    Corral Facility ...........................................................................................................3

    C.    Acclimation Pasture ..................................................................................................5

    D.    Pastures ......................................................................................................................5

III.    RECEIVING WILD HORSES AND BURROS........................................................6

    A.    Loading and Unloading Areas ..................................................................................6

    B.    Receiving Procedures.................................................................................................6

IV.    CARE OF WILD HORSES AND BURROS ............................................................7

    A.    Health Care ................................................................................................................7

    B.    Biosecurity .................................................................................................................7

    C.    Feed and Water ..........................................................................................................8

    D.    Observations and Inventory ......................................................................................9

    E.    Preparation Procedures .............................................................................................9

    F.    Euthanasia Procedures ............................................................................................10

    G.    Carcass Disposal .....................................................................................................11

V.    HANDLING WILD HORSES AND BURROS .........................................................11

    A.    Willful Acts of Abuse .............................................................................................11

    B.    General Handling .....................................................................................................12

    C.    Handling Aids ..........................................................................................................12

VI.    PUBLIC VISITATION or TOURS .........................................................................13

    A.    Public Visitors.........................................................................................................13

    B.    Adoption/Sale at Off-Range Pastures .....................................................................13

# ANIMAL WELFARE STANDARDS OFF-RANGE PASTURES

## I. PASTURE PERSONNEL

### A. General

1. The off-range pasture operator must establish and implement standards of care, treatment, and handling of wild horses and burros, and communicate these expectations to all personnel to ensure the humane care and treatment of all wild horses and burros at the off-range pasture.

2. The off-range pasture operator must have enough employees or volunteers with training, skills, and experience to observe, move, and handle the wild horses and burros on the off-range pasture.

3. The off-range pasture operator must have personnel that can properly maintain the working chute system and facility infrastructure to provide for the safe housing, movement, and prepping of the wild horses and burros.

4. The off-range pasture operator should maintain necessary and appropriate records.

## II. OFF-RANGE PASTURE DESIGN

### A. General

1. Off-range pastures must be free of hazards such as unfenced paved public highways, junk, spools of wire or other stored fencing materials, old cars, or any other hazards that could cause injury. They must not be located in areas with unfenced paved highway or high traffic areas.

2. Off-range pastures must be operated in a manner to provide a safe, clean, and supportive environment for all wild horses and burros.

3. Non-essential personnel and equipment must be located to minimize disturbance of wild horses and burros.

4. Trash, debris, and reflective or noisy objects should be eliminated from the off-range pasture.

### B. Corral Facility

1. The corral facility must be constructed of stout materials and must be maintained in proper working conditions with gates that swing freely and latch easily.

2. The sorting corral facility must have a minimum of three sorting corrals with a minimum of 2,500 square feet each for holding wild horses and burros for short-term (up to 5 days prior to shipment).

3. In addition to the sorting corrals and small acclimation pastures, pasture/dry lot space must be available for close-up holding of 20% of the wild horses and burros at the off-range pasture for periods up to 90 days.

4. The off-range pastures must have enough corrals to sort wild horses and burros according to sex, age, temperament, health status, or physical condition as needed.

5. The off-range pastures must furnish a concrete or graveled area and electricity (120 volts) for a hydraulic chute provided by the BLM.

6. All corrals and pens must always have water available for animals maintained therein.

7. The off-range pasture corral facility fences must be of stout design, materials, and be maintained in proper conditions with no holes, gaps, opening, protruding surfaces, or sharp edges present which could result in wild horses and burros being injured or that may cause escape. The off-range pasture corral facilities may be permanent or temporary (portable panels).

8. The off-range pasture corral facilities must be not less than 6 feet high for wild horses and 5 feet high for burros, and the bottom rail must not be more than 12 inches from the ground level.

9. Barbed wire fencing must not be used in the construction of the off-range pasture corral facility.

10. Mesh wire is allowable if openings are not larger than 2 inches by 4 inches. Mesh wire fences must be equipped with at least 3 wooden sight boards (2 inches by 8 inches), located on the upper portion of the fence.  The three sight boards must be spaced no more than 12 inches apart.

11. Off-range pasture corrals constructed of pipe or wood must have opening of not more than 12 inches between horizontal members.

12. Soil type in corrals must be well-drained and non-alkaline in nature; slopes within corrals must provide adequate drainage.

13. Corral gates must be constructed of wood or pipe and be the same height as the fences.

14. Gates in corrals must be visible to the wild horses and burros either from the materials used in construction or by using materials such as plywood, or plastic mesh placed on the gate creating a visual barrier.

15. The design of the pens used for crowding wild horses and burros during handling should be oval or constructed with rounded corners.

16. Chutes and crowding alleys must be available to facilitate gathering, preparing, and shipping animals and must be solidly constructed of steel or lumber.

17. Single-file alley runways must have at least three sliding gates, be solidly constructed of steel or lumber, be at least 36 feet in length, 28-32 inches wide, and at least 6 feet tall.

IM 2023-041, Attachment 1

## C. Acclimation Pasture

1. At least two or more acclimation pastures must be available to maintain 100 wild horses and burros while adapting to feeding and equipment before release into large pastures, to hold foals during the weaning process, or to maintain wild horses and burros prior to shipment (30 days or more).

2. Small acclimation pasture(s) must be available for adaption to feeding and equipment before release into large pastures.  Acclimation pastures may also be used for holding wild horses and burros awaiting shipment.

3. Acclimation pastures must have water available at all times for wild horses and burros maintained therein.

4. Acclimation pastures fences must be constructed low to the ground, the bottom wire must not be more than of 12 inches off the ground to prevent foals from going under the fence.

5. Barbed wire fencing is allowed in the construction of the acclimation pasture(s) if the following guidelines are followed:

   a. Fences must be a minimum of 48 inches high.

   b. Fences must have a minimum of 4 wires.

   c. Fences must have spaces not more than 12 inches between wires.

   d. When new animals are introduced to the acclimation pasture, fencing must be marked with at least 8 inches of flagging and/or other visual aids attached to the top wire every 20 feet.

## D. Pastures

1. Pastures must be of sufficient size to allow wild horses and burros freedom of movement and ability to exercise for good health and natural hoof wear to maintain hoof condition.

2. Pastures must have sufficient rock and soil types to maintain proper hoof size and shape without the need for trimming. Manmade enhancements that cause natural wear of hooves may be acceptable, especially around water sources or feed areas.

3. All pasture fences and division fences must consist of a minimum of 4 strands of barbed wire or other acceptable fencing materials with a minimum height of 4 feet.

4. Gates, rather than cattle guards, must be used at road crossing or fence openings to keep wild horses and burros in pastures.

5. Shelter from wind must be provided in each pasture by topography (e.g., canyons, hills, etc.), other natural features such as trees, or manmade structures.

## III.    RECEIVING WILD HORSES AND BURROS

### A. Loading and Unloading Areas

1. The areas for loading and unloading wild horses and burros must be maintained in a safe and proper working condition, including gates that swing freely and latch or tie easily. The off-range pasture must have a loading chute(s) sufficient to safely unload and load semi-trailer trucks and small stock trailers.

2. Supplemental lighting must be provided to facilitate visibility during low light conditions.

3. Access to the loading and unloading chute must be available during inclement weather.

4. Loading and unloading ramps must have a non-slip surface and be maintained in a safe and proper working condition to prevent slips and falls. Examples of non-slip floors would include, but not be limited to, rubber mats, sand, shavings, and steel reinforcement rods built into the ramp. There must be no holes in the flooring or items that can cause an animal to trip.

5. Trailers must be properly aligned with loading and unloading chutes and panels such that no gaps exist between the chute/panel and floor and sides of the trailer creating a situation where a wild horse and burro could injure itself.

6. The side panels of the loading chute must be a minimum of 6 feet high and have solid sides a minimum of 5 feet high covered with materials such as plywood or metal without holes, gaps, or openings, protruding surfaces, or sharp edges that may cause escape or possible injury.

7. For loading, a single alley is required.

8. The design of the pens used for crowding wild horses and burros during handling should be oval or constructed with rounded corners.

9. Working area fencing must be at a minimum of 6 feet high for wild horses and 5 feet high for burros, stoutly constructed and made of lumber, pipe or steel.

10. All gates and doors must open and close easily and latch securely.

11. Stock trailers should be positioned for loading or unloading such that there is no more than 12 inches clearance between the ground and floor of the trailer for burros and 18 inches for wild horses.

### B. Receiving Procedures

1. All unloading of wild horses and burros must be performed during daylight hours except when unforeseen circumstances develop, and the Authorized Officer approves the use of supplemental light.

2. At the time of unloading, wild horses and burros must be inspected by the off-range pasture operator to look for signs of infectious disease, sickness or injury and take appropriate steps if these conditions are observed including reporting them back to BLM.

3. Wild horses and burros must be unloaded, sorted, and separated as needed upon their arrival at the off-range pasture.

4. An authorized, properly trained, and experienced person, as well as euthanasia equipment and supplies, must be available immediately following unloading if the emergency euthanasia of an animal is required.  Euthanasia must be done in compliance with BLM Euthanasia policy.

5. The off-range pasture operator must document any wild horse and burro that is recumbent or dead upon arrival at the destination and notify the COR and/or PI.

6. Newly arrived wild horses and burros must immediately be provided hay of good quality and water upon unloading.

7. All neck tags must be removed if present before wild horses and burros are turned out into acclimation pastures or pastures.

## IV.    CARE OF WILD HORSES AND BURROS

### A. Health Care

1. Off-range pastures must be free-roaming environments and individual animal health care will not be routinely provided.

2. Treatment or euthanasia of sick or injured animals as an act of mercy must be authorized by the COR/PI.

### B. Biosecurity

1. The off-range pasture operator must consult with the COR/PI to establish and review biosecurity and health care protocols and decisions.

2. Wild horses and burros newly arrived from gather operations, off-range corrals, or other off-range pastures must not be co-mingled with resident animals at the off-range corral for a minimum of three weeks.

3. Domestic horses must not be stocked adjacent to or with wild horses and burros.

4. Working chutes and tub systems should be routinely cleaned and disinfected to reduce the risk of disease transmission, especially after moving contagious wild horses or burros through the system.

5. Pens must be provided to segregate sick, infectious, injured, or weak wild horses or burros from other healthy individuals in the facility when possible. These pens must have shelter from wind such as dense hedgerows of trees and shrubs, solid fences, or other manmade windbreaks.

## C. Feed and Water

1. Before wild horses and burros show an unacceptable body condition (Henneke BSC less than 4), specific supplemental feeding practices appropriate for wild horses and burros must be developed and implemented in consultation with the COR/PI.

2. Supplemental feed must be accessible for pastured wild horses and burros during times when natural forage will not maintain the wild horses and burros in at least moderately thin to moderate condition (Henneke Body Condition Score (BCS) 4-5), and/or when inclement weather prevents grazing.

3. Supplemental feed must not be fed to individual wild horses or burros in declining health resulting from age and natural causes.

4. Supplemental feed must be provided to wild horses and burros in a clean, well-drained area free of mud and standing water.

5. Supplemental feed must be of such quality and fed in sufficient quantity to sustain wild horses and burros in moderately thin to moderate condition (Henneke Body Condition Score (BCS) 4-5).

6. Wild horses and burros in corrals, pens, or acclimation pasture areas must be fed hay daily in sufficient quantity to sustain wild horses and burros in moderately thin to moderate condition (Henneke Body Condition Score (BCS) 4-5).

7. Hay used as supplemental feed must be leafy, green, well cured, and free of dust, mold, weeds, and foreign material.

8. Feeding sites must allow for all wild horses or burros within the corral or acclimation pastures simultaneous access to hay with an additional 20% of space to allow wild horses or burros to move about and change position while eating.

9. Granulated, rock or block salt and trace minerals must be accessible to all wild horses and burros in each pasture.

10. The available standing vegetation in pastures must be of sufficient nutritive quality and quantity with pasture stocking rate adjusted as necessary to assure the majority of wild horses and burros are maintained in at least moderately thin to moderate conditions (Henneke Body Condition Score (BCS) 4-5) at all times.

11. A Henneke Body Condition Score of four or better should be maintained for a minimum of 95% of the animals present at all times. No greater than 5% of the animals should have a body condition score of three at any time, and no animals should be maintained at the body conditions score of two or less. Animals with a body condition score less than 3 must be individually evaluated with a prognosis for recovery considered as referenced in the BLM Euthanasia policy (PIM 2021-007).

12. No wild horses or burros should have a body condition greater than 7.

IM 2023-041, Attachment 1

13. Vegetative monitoring must be completed annually in each approved off-range pasture as specified by individual wild horse and burro management agreements or contracts.

14. The maximum distance to water in any pasture must be 2 miles.

15. Watering systems in wild horse and burro holding corrals, pens, acclimation pastures and pastures must always provide a continuous supply of clean water appropriate for livestock.

16. Water troughs and watering systems in holding corrals, pens, acclimation pastures and pastures must be checked daily to ensure a continuous supply of clean water.

## D. Observations and Inventory

1. Wild horses and burros must be observed by the off-range pasture operator at a minimum of one time per week to determine the overall condition of the wild horses and burros and record any deaths that may occur.

2. Observations must be conducted by the off-range pasture operator more frequently when conditions warrant such as during flooding, tornados, blizzards, and fires to ascertain the safety and well-being of the wild horses and burros and to assure fences are properly maintained.

3. Observations by the off-range pasture operator must be carried out on foot, from a vehicle, or horseback. In emergency situations, such as deep snow, etc., aircraft may be used with prior approval of COR/PO.

4. Any problems or concerns observed by the off-range pasture operator must be reported to COR/PO within 24 hours of discovery.

5. The off-range pasture operator must maintain an inventory that identifies the location of each wild horse and burro occupies and the death of any wild horse and burro with probable cause. The 4-digit freeze mark on the hip, the angle freeze mark on the left side of the neck or a microchip implanted into the left side of the neck (for animals prepped after 2019) will be used to identify each wild horse and burro.

## E. Preparation Procedures

1. Gathering for the purpose of weaning foals or removing animals must not be conducted more than three times per year. The gather time will be determined by the COR/PO.

2. Gathering or movement of wild horses and burros from pastures must be done with the concurrence of the COR/PO, except in emergency conditions when the off-range pasture operator determines an immediate gather or movement is necessary for the safety and welfare of the wild horses and burros. The off-range pasture operator must notify the COR/PO within 24 hours after such movement.

3. Foals born at the off-range pasture must be gathered by the off-range pasture operator from pastures and made available upon BLM request. Shipment of foals will occur within 12 months but not before 4 months of age.

4. The off-range pasture operator must gather and trim hooves of wild horses and burros if needed to keep their feet in good shape, as identified the COR/PO.

5. The off-range pasture operator must assist the COR/PI or veterinarian in the handling and movement of wild horses and burros to administer booster vaccinations, trimming of hooves, drawing blood for Coggins test and de-worming if wild horses and burros are designated to leave the off-range pasture.

6. Aggressive wild horses and burros in corral areas should be separated or processed in a timely manner to prevent or minimize injury to other wild horses and burros.

## F. Euthanasia Procedures

1. Euthanasia must be done in compliance with BLM Euthanasia Policy PIM No 2021-007, Euthanasia of Wild Horses and Burros Related to Acts of Mercy, Health, or Safety.

2. Animals that are severely injured or acutely suffering must be immediately euthanized.

3. A properly trained and experienced person or persons authorized by the Authorized Officer and meeting the requirements found in Section II. C. of the Euthanasia policy will be available on site or on call within 72 hours to perform euthanasia as needed at an off-range pasture.

4. Firearms and ammunition suitable for field euthanasia, must be available at off-range pastures at all times in the event that the emergency euthanasia of an animal is required.

5. The BLM COR/PI responsible for oversight of the off-range pasture will evaluate all wild horses and burros and establish their body condition periodically throughout the year, particularly if the facility is experiencing drought or some other event which might limit forage availability.

6. At any time during the year, if any wild horse and burro is acutely suffering from any of the qualifying conditions A-F Euthanasia policy as described in the Policy the COR, PO, PI, contractor, partner, or another person as described in IV. F. 2. above will euthanize that wild horse and burro, within 24 hours of identification.

7. On an annual basis, a team including a BLM Wild Horse and Burro Specialist and a U.S. Department of Agriculture (USDA) Animal and Plant Health Inspection Service (APHIS) or other veterinarian acceptable to the BLM will formally evaluate the condition of each animal on the off-range pasture prior to the onset of severe winter weather to identify animals with physical, or health problems or concerns related to body condition.

IM 2023-041, Attachment 1

8.  Wild horses and burros that are chronically affected with a body condition score of less than 3 or that have a poor prognosis for improvement to a body condition score greater than 3 will be euthanized within 72 hours.

9.  Wild horses and burros with a body condition score of three, or less that do not appear to be acutely suffering or have a fair or better prognosis for improvement will be rechecked in 30 days. Those that remain below body condition score 3 will be euthanized within 72 hours of the second evaluation.

10. Any wild horse and burro that dies or is euthanized must be documented including the circumstances, freeze mark ID if present, a description of the age, sex, color of the animal and the reason the animal died or was euthanized. The COR/PI must be notified within 24 hours, and a death record must be entered into the WHBPS. In general terms a reason for euthanasia should never be unknown.

11. If the cumulative mortality from all causes for any month has more than doubled from the historical numbers for that premises (typically 0.0025 of the population or ¼ % per month) the COR/PI should review the history and death records for that facility in consultation with a veterinarian including postmortem physical examinations or necropsies if indicated to understand the causes of mortality and potentially limit future losses.

## G. Carcass Disposal

1.  The COR/PI and the off-range pasture operator must ensure that appropriate procedures are in place for the timely disposal of carcasses, when necessary, at off-range pasture facilities.

2.  Compensation for disposing of the carcass must not be received by any BLM personnel or person associated with the off-range pasture.

3.  Disposal of carcasses must be in accordance with applicable state and local laws.

# V. HANDLING WILD HORSES AND BURROS

## A. Willful Acts of Abuse

1.  Hitting, kicking, or beating any wild horses and burros in an abusive manner is prohibited.

2.  Dragging a recumbent wild horses and burros without a sled, slide board or slip sheet is prohibited. Ropes used for moving the recumbent animal must be attached to the sled, slide board, or slip sheet.

3.  There should be no deliberate driving of wild horses and burros into other animals, closed gates, panels, or other equipment.

4.  There should be no deliberate slamming of gates and doors on wild horses and burros.

5.  There should be no excessive noise (e.g., constant yelling) or sudden activity

causing wild horses and burros to become unnecessarily flighty, disturbed or agitated.

## B. General Handling

1. All sorting, loading, or unloading of wild horses and burros must be performed during daylight hours except when unforeseen circumstances develop, and the Authorized Officer approves of the use of supplemental light.

2. Halters and ropes tied to a wild horse and burro may be used to roll, turn, position, or load a recumbent animal, but a wild horse and burro must not be dragged across the ground by a halter or rope attached to its body while in a recumbent position.

3. Wild horses and burros should be moved into and out of pens in a manner that will minimize stress and injury.

4. When possible, wild horses and burros should be allowed to move at their own pace to new pens or sorting/handling locations.

5. Wild horses and burros should be handled to enter runways or chutes in a forward direction.

6. No wild horse or burro should remain in single-file alleyways, runways, or chutes longer than 30 minutes.

7. No equipment should be operated in such a manner as to cause flighty behavior or injury to wild horses and burros.

## C. Handling Aids

1.     Handling aids such as flags and shaker paddles must be the primary tools for driving and moving wild horses and burros during handling and transport procedures. Contact of the flag or paddle end of primary handling aids with a wild horse and burro is allowed. Ropes looped around the hindquarters may be used from horseback or on foot to assist in moving an animal forward or during loading.

2.     Electric prods must not be used routinely as a driving aid or handling tool. Electric prods may be used in limited circumstances only if the following guidelines are followed:

   a. Electric prods must only be a commercially available make and model that uses DC battery power with batteries fully charged at all times.

   b. The electric prod device must never be disguised or concealed.

   c. Electric prods must only be used after three attempts using other handling aids (flag, shaker paddle, voice, or body position) have been tried unsuccessfully to move the wild horses and burros.

IM 2023-041, Attachment 1

    d.   Electric prods must only be picked up when intended to deliver a stimulus; these devices are not constantly carried by the handlers.

    e.   Space in front of an animal must be available for the wild horse and burro to move forward prior to application of the electric prod.

    f.   Electric prods must never be applied to the face, genitals, anus, or underside of the tail of a wild horse and burro.

    g.   Electric prods must not be applied to any one wild horse and burro more than three times during a procedure (e.g., sorting, loading) except in extreme cases with the approval of the Authorized Officer. Each exception must be approved at the time by the Authorized Officer.

## VI. PUBLIC VISITATION or TOURS

### A. Public Visitors

1. All visitors must be advised to maintain a safe distance from wild horses and burros.

2. Visitors must not be allowed to feed wild horses or burros other than gentled animals for demonstration or display purposes.

3. Visitors must not haul in outside horses for the purpose of getting in close contact with wild horses or burros at off-range pastures.  No horses, other than those managed by the off-range pasture operator, will be allowed to come in contact with wild horses and burros at off-range pasture.

4. Facility infrastructure (building restroom, parking lots, etc.) must be separated from wild horse and burro pastures via fencing.  Wild horses and burros must not "roam" amongst areas of concentrated visitors.

5. Off-range pasture tours must not intentionally chase or harass wild horses and burros at off-range pastures.

### B. Adoption/Sale at Off-Range Pastures

1. All facilities for Adoption/Sale at off-range pastures must be operated in a safe, clean, and supportive environment for all wild horses and burros.

2. The facility must have enough pens available to sort wild horses and burros according to sex, temperament, or physical needs.

3.  The off-range pasture corrals, fences, gates, alleys, and working chutes must be constructed of stout materials and must be maintained in proper working condition.

4.  Fences in adoption pens, alleys, and working chute systems must not be less than 6 feet high for wild horses and 5 feet high for burros.

5.  Adoption pen fences must be of stout design and must be maintained in proper condition with no holes, gaps, or sharp edges that could result in wild horses and

IM 2023-041, Attachment 1

burros being injured.

6.   Watering systems in wild horse and burro adoption holding pens must always provide unlimited access to clean water appropriate for livestock.

7.   Adoption pen feeding areas must be accessible to all wild horses and burros in the pen at the same time plus an additional 20% of room for reshuffling position while eating.

8.   Ground surfaces in adoption pens should promote drainage to reduce wet ground conditions.

9.   Wild horses and burros in pens at the facility should be maintained at a stocking density such that when at rest all wild horses and burros occupy no more than half the pen area.

IM 2023-041, Attachment 1