Anthony W. Merrill (#022598)
Amanda Z. Weaver (#034644)
John Habib (#037431)
Sukhmani K. Singh (#039586)
SNELL & WILMER L.L.P.
One East Washington Street
Suite 2700
Phoenix, Arizona 85004-2556
Telephone:    602.382.6000
Facsimile:    602.382.6070
Email: amerrill@swlaw.com
       aweaver@swlaw.com
       jhabib@swlaw.com
       ssingh@swlaw.com

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| International Society for the Protection of Mustangs and Burros, a non-profit organization, and Betty Nixon, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> United States Government, Department of Agriculture, Brooke L. Rollins, as the acting Secretary of Agriculture, Tom Schultz, as Chief of the U.S. Forest Service, and Joshua Miller, as acting Forest Supervisor, and Does 1 through 10, <br><br> Defendants. | No. <br><br> **VERIFIED COMPLAINT** |

## NATURE OF THE CASE

1.    Plaintiffs International Society for the Protection of Mustangs and Burros ("ISPMB") and Betty Nixon (collectively "Plaintiffs") bring this civil action against Defendants United States Forest Service ("Forest Service"), United States Department of Agriculture ("USDA"), and their officials, challenging the Final Territory Management Plan (the "Final TMP"), Final Environmental Assessment for the Heber Wild Horse

Territory ("Final EA"), and the associated Finding of No Significant Impact ("FONSI"), issued in January 2026.

2. Plaintiffs allege that the Final TMP, Final EA, and FONSI violate: (a) the Administrative Procedure Act (the "APA"), 5 U.S.C. §§ 701-706; (b) the Wild Free-Roaming Horses and Burros Act of 1971 ("Wild Horse and Burro Act" or "the Act"), 16 U.S.C. §§ 1331-1340; (c) the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370j; and (d) the 2007 Stipulated Settlement Agreement entered in the United States District Court for the District of Arizona, Case No. CV-05-2754-PHX-FJM.

3. ISPMB seeks declaratory relief, injunctive relief, and an order vacating the Final TMP, Final EA, and FONSI, and requiring Defendants to comply with federal law in any future management actions affecting the Apache-Sitgreaves National Forests, including the Heber Wild Horse Territory ("HWHT" or "Territory") and wild horses found in, near, or around the HWHT (the "Heber Herd").

**THE PARTIES**

4. Plaintiff ISPMB is a non-profit organization formed to promote animal welfare and protection, including the protection of wild horses. ISPMB is the oldest wild horse and burro organization in the United States.

5. ISPMB was instrumental in securing and implementing the Wild Free-Roaming Horses and Burros Act of 1971, along with its first president, Wild Horse Annie.

6. ISPMB was headquartered in Arizona from approximately 1993 until 2000 when it relocated its headquarters to Rapid City, South Dakota. ISPMB has members who live in Arizona, including in or around Heber, and other members who visit the Apache-Sitgreaves National Forests area frequently, including to observe and enjoy the Heber Herd.

7. ISPMB has been actively engaged in protecting the Heber Herd for many years and is a party to the 2007 Stipulated Settlement Agreement. ISPMB's interests in the protection of wild horses and the Heber Herd are directly harmed by the challenged agency actions.

SNELL & WILMER

8. Plaintiff Betty Nixon is a member of ISPMB who resides in Overgaard, Arizona. She has lived there for eight years.

9. For the last seven and a half years, Ms. Nixon has dedicated approximately 25-30 hours per week to observing, tracking, and advocating for the wild horses in the Apache-Sitgreaves National Forests, including the Heber Herd.

10. Ms. Nixon gathers significant aesthetic and recreational enjoyment from observing, watching, and surveying the Heber Herd, particularly in observing and learning from their behaviors that are individualized and specific to the Heber Herd.

11. Ms. Nixon's significant enjoyment comes from observing their behaviors in family bands and noting how they interact within those natural bands, and with other family bands in the Apache-Sitgreaves National Forest, including family bands within the Heber Herd.

12. Ms. Nixon is also personally aware of other individuals who gather significant personal aesthetic and recreational enjoyment from observing, watching, photographing, and surveying the horses in the Heber Herd.

13. Defendant United States Forest Service is a federal agency within USDA responsible for the management of the Apache-Sitgreaves National Forests and the Heber Wild Horse Territory.

14. Defendant USDA is the cabinet-level federal agency responsible for federal policy on food, agriculture, and natural resources, including oversight of the Forest Service.

15. Defendant Brooke Rollins is the Secretary of Agriculture and is sued in her official capacity.

16. Defendant Tom Schultz is the Chief of the U.S. Forest Service and is sued in his official capacity.

17. Defendant Joshua Miller is the acting Forest Supervisor of the Apache-Sitgreaves National Forests and is sued in his official capacity.

- 3 -

18. Does 1-10 are officials and employees of the Forest Service and USDA whose identities are currently unknown but who have responsibility for the decisions challenged herein.

## JURISDICTION & VENUE

19. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (United States as a defendant), the APA, 5 U.S.C. §§ 701-706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

20. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e) because a substantial part of the events or omissions giving rise to the claims occurred within this district, the Heber Wild Horse Territory is located within this district, and the 2007 Federal Court Order and Stipulated Settlement Agreement were entered by this Court.

21. ISPMB has exhausted all available administrative remedies by timely submitting detailed comments to the Forest Service during the scoping period in March 2020, during the Draft EA comment period in April 2021, and by filing formal objections to the Final TMP in October 2025.

## GENERAL ALLEGATIONS

### *Wild Horses Are Expressly Federally Protected*

22. In passing the Wild Free-Roaming Horses and Burros Act of 1971, Congress expressly declared and codified in law that "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West; that they contribute to the diversity of life forms within the Nation and enrich the lives of the American people; and that these horses and burros are fast disappearing from the American scene. It is the policy of Congress that wild free-roaming horses and burros shall be protected from capture, branding, harassment, or death; and to accomplish this they are to be considered in the area where presently found, as an integral part of the natural system of the public lands." 16 U.S.C. § 1331. *See also* 16 U.S.C. § 1331, et seq.

23. The Heber Wild Horse Territory is located in the Black Canyon area of the Black Mesa Ranger District of the Apache-Sitgreaves National Forests in Arizona and consists of approximately 19,700 acres.

24. The Territory was established pursuant to the Wild Horse and Burro Act to provide a range for the protection and preservation of wild horses.

25. Historical evidence demonstrates that wild horses have inhabited the Mogollon Rim region, where the Territory is located, since at least the early 1900s and likely since the late 17th century, when Jesuit Priest Father Eusebio Kino brought horses to the area during explorations for mission sites.

26. An expert report by equine behaviorist Mary Ann Simonds concluded that wild horses have inhabited the Mogollon Rim since at least the early 1900s, and field observations confirmed at least two or more distinct stable bands of 15-30 wild horses in or near the Territory.

27. Wild horses will naturally separate from their families as they grow and exist in "bands," which are usually either (1) "family bands" with an older/experienced stallion (grown male) and one or more mares (grown females) with one or more foals (baby/juvenile horses of either sex); or (2) "bachelor bands," which are groups of one or more (often younger) stallions who do not have their own family bands.

28. By law, the wild and free roaming horses in the Apache-Sitgreaves National Forests area are not confined to the Territory but rather are permitted to free roam throughout the Apache-Sitgreaves National Forests. 16 U.S.C. §§ 1331, 1332(b).

29. Rounding up horses inevitably disrupts bands, as stallions with family bands will seek to protect their band members from the threat, and will likely be separated from their bands, with disruption and discord inevitable from bachelors in close proximity to family bands separated from their stallions, and the potential for foals to be separated from their mothers, risking injury and death—particularly during foaling season.

30. Wild horses, unlike cattle, do not fully strip the surrounding environment of resources, both by less disruption to the soil from their hooves (as opposed to cloven hooves

SNELL & WILMER

- 5 -

with greater force on each hoof from cattle), and by leaving greater remnants of plant matter for regeneration (as opposed to cattle stripping plant material down to the root).

31. Unfortunately, upon information and belief, the U.S. Forest Service has issued permits for cattle grazing throughout the HWHT. Unlike the wild horses at issue, cattle are not subject to express statutory protection under 16 U.S.C. § 1331, *et seq*. or any other applicable statute.

### *The 2005 Litigation*

32. In 2005, the Forest Service issued a Solicitation for Bid for the capture, relocation, and sale of at least approximately 120 horses from the Apache-Sitgreaves National Forests, without conducting a census, inventory, or environmental analysis.

33. Shortly thereafter, ISPMB and other plaintiffs filed suit in the United States District Court for the District of Arizona, Case No. CV-05-2754-PHX-FJM, challenging the Forest Service's actions as violating the Wild Horse and Burro Act, NEPA, and the APA.

34. Sworn affidavits submitted in the 2005 litigation establish that long-time residents of the Heber area observed wild, unbranded horses in the Apache-Sitgreaves Forests continuously from the 1930s through the present day, including for more than 30 years prior to the 2002 Rodeo-Chediski Fire.

35. This Court granted ISPMB's motion for a preliminary injunction, finding that plaintiffs raised "at least serious questions as to the legality of the defendants' actions."

36. In its Order Granting Injunction, the Court explained that 36 C.F.R. § 222.25 "requires the surveillance and protection of wild horses on National Forest lands, other public lands, and lands of other ownership or jurisdiction."[1]

37. The Court also found the evidentiary value of the Forest Service's documentation of zero horses to have "de minimis value, because [the Forest Service] failed to explain how the figures were derived." **Ex. A** at 4.

---

[1] Code of Federal Regulation Title 36, Section 222.25 was recodified to Section 222.65 in 2013.

38.   The case was resolved through the 2007 Stipulated Settlement Agreement, **Exhibit B**, which required the Forest Service to:

a. Develop a Territory Management Plan with public involvement before gathering or removing horses in the Heber Wild Horse Territory, as well as on the Black Mesa and Lakeside Ranger Districts;

b. Consider the International Society for the Protection of Mustangs and Burros' comments on the Territory Management Plan; and

c. Coordinate with the White Mountain Apache Tribe to repair and maintain the boundary fence.

39.   In addition, in the 2007 Stipulated Settlement Agreement, the Forest Service agreed that "the Heber Wild Horse Territory still exists and has not been dissolved" and that "wild horses are by law an integral part and component of the natural system of the public lands".

### *The Forest Service's Failure to Comply with Federal Statutes and Regulations*

40.   In January 2020, the Forest Service published a Proposed Action Document initiating the scoping period for the Heber Wild Horse Territory Management Plan.

41.   In March 2020, ISPMB submitted detailed comments to the Proposed Action Document, including a 38-page letter and 2,275 pages of supporting documentation.

42.   In its March 2020 comments, ISPMB raised concerns about, among other things:

a. The Forest Service's violation of the 2007 Stipulated Settlement Agreement by failing to involve the public in creating the Proposed Action Document;

b. Vagaries in the Proposed Action to the point that no clear plan is discernible;

c. The Forest Service's decision to prepare only the Final EA rather than a full Environmental Impact Statement given the Proposed Action constituting a significant federal action affecting a historical and cultural resource of national importance;

d. Failure to consider meaningful alternatives to restricting the Heber Herd to the Territory;

e. Reliance on unreliable and incomplete data regarding the Heber Herd's population;

f. Failure to rely on scientific studies regarding the use and efficacy of contraceptives while proposing contraceptives as the primary management technique;

g. The Working Group, including its composition and the composition of the administrative record on which it relied; and

h. Failure to allocate forage consistent with federal law.

43. Also in March 2020, Plaintiff Betty Nixon submitted detailed comments to the Proposed Action Document.

44. In March 2021, the Forest Service published the Draft EA and Draft Territory Management Plan.

45. In April 2021, ISPMB submitted detailed comments to the Draft EA.

46. In its April 2021 comments, ISPMB raised concerns about, among other things:

a. Violations of the Administrative Procedure Act by creating a purportedly "appropriate" management level which relies on the false premise that the Heber Herd must be confined to the Heber Wild Horse Territory;

b. The Forest Service's failure to meaningfully respond to public comments during scoping;

c. The Forest Service's inexplicable deviation from the BLM Wild Horses and Burros Management Handbook by (1) calculating appropriate management levels based on "average available forage production" rather than the number of horses using the area and (2) setting the Heber Herd size at 104 in disregard of the Handbook's minimum herd size of 150-200 required for genetic diversity;

- 8 -

    d.   The Forest Service's reliance on historical population surveys which the court in the 2005 litigation found to be of "de minimis" evidentiary value; and

    e.   The Forest Service's failure to prepare a full environmental impact statement given the scope and controversy of the proposed management plan and the impact on a historical and cultural resource of national importance.

47.    Also in April 2021, Plaintiff Betty Nixon submitted detailed comments and objections to the Draft EA.

48.    In July 2025, the Forest Service published the Final TMP.

49.    In August 2025, the Forest Service published the EA.

50.    In October 2025, ISPMB submitted formal objections to the Final TMP and Final EA.

51.    In its October 2025 comments, ISPMB raised concerns about, among other things:

    a.   The arbitrary and capricious nature of the Forest Service's appropriate management level of 50-104 horses;

    b.   The Forest Service's refusal to designate the Heber Herd as "wild free-roaming horses" under 16 U.S.C. § 1332, which contradicts the historical and scientific record and violates the 2007 Stipulated Settlement Agreement;

    c.   Authorization of long-term fertility control without identifying specific methods, analyzing risks to herd behavior, or considering other alternatives;

    d.   The Forest Service's failure to prepare a full environmental impact statement given the scope and controversy of the proposed management plan and the impact on a historical and cultural resource of national importance;

    e.   Failure to provide ISPMB notice of the Final TMP or Final EA, in violation of the 2007 Stipulated Settlement Agreement; and

    f.   Failure to meaningfully respond to public comments in violation of NEPA's procedural requirements.

52.     Also in October 2025, Plaintiff Betty Nixon submitted formal objections to the Final TMP and Final EA.

53.     On January 29, 2026, the Forest Service issued a Finding of No Significant Impact and Decision Notice approving the Final TMP.

54.     On April 9, 2026, the Forest Service issued a letter from Acting Forest Supervisor, Joshua Miller, dated March 9, 2026 ("April 2026 Letter") declaring for the first time that the horses currently present on the Sitgreaves National Forest are not "wild free-roaming horses," but instead "unauthorized livestock" that he alleges were introduced after 1971 and are subject to impoundment under Forest Service regulations.

55.     The Final TMP establishes an Appropriate Management Level of 50-104 horses for the Heber Wild Horse Territory.

56.     The Final TMP authorizes population management actions including gathering and removal of horses, and long-term fertility control measures.

57.     The Final TMP authorizes construction of permanent and temporary gather facilities, including a 61-acre holding facility.

58.     The Final TMP restricts management of wild horses to the approximately 19,700-acre Territory, despite evidence that wild horses historically roamed and currently inhabit a much larger area including the Black Mesa and Lakeside Ranger Districts and the Forest Service's statutory obligation to protect wild horses where presently found.  16 U.S.C. §§ 1331, 1332(b).

59.     In its Finding of No Significant Impact, the Forest Service made no effort to address any of Plaintiffs' objections.

60.     The reclassification discussed in the April 2026 Letter was not disclosed, analyzed, or even referenced in the Final TMP or FONSI, all of which proceeded on the premise that the horses would be managed under the Act.

61.     Upon information and belief, cattle ranchers in the Apache-Sitgreaves National Forests area have begun constructing bait traps and corrals near the East Buckskin Tank on Forest Road 51 to gather wild horses for their eventual removal.

- 10 -

62. Upon information and belief, these corrals fail to meet the minimum standards to guarantee the safety of wild horses. Deficiencies include: being built at an unsafe height for wild horses (less than 6 feet tall), being built using barbed wire and hog fencing, built with t-posts at heights which allow for horses to impale themselves, being built with long twisted wires protruding from posts, being built using metal piping that is dangerous for wild horses, and being built with areas where wild horses can get their legs caught and trapped.

63. Upon information and belief, the Forest Service has not authorized the actions of these cattle ranchers but is aware of their activities and has failed to take action to prohibit the construction of wild horse traps.

64. Since 2018, more than thirty Heber wild horses have been unlawfully shot and killed in or around the Heber Wild Horse Territory.

65. These killings represent a persistent and escalating threat to the survival of the Heber Herd.

66. ISPMB submitted detailed documentation of the killings in prior comments to the Forest Service, including eyewitness accounts and reports to Forest Service investigators.

67. The Final EA contains no analysis of these killings' impact on herd viability and no enforceable protective measures.

68. Upon information and belief, the U.S. Forest Service has failed historically and presently to meaningfully survey or inventory the Apache-Sitgreaves National Forests for the presence of wild free-roaming horses. As such, the U.S. Forest Service does not have a basis for its decisions related to the horses in the Apache-Sitgreaves National Forests near, around, or on the HWHT.

69. Furthermore, upon information and belief, the U.S. Forest Service does not have support, reliable or otherwise, for the number of wild horses actually present in the HWHT.

- 11 -

70. For example, ISPMB issued a FOIA request in May 2024 requesting documentation supporting the figures in claims from, *inter alia*, the USDA Forest Service Wild Horse and Burro Program December 2023 Advisory Board Meeting update that (1) there were "around 1700 horses on the territory," (2) that "there was a plan to gather as many as 600 horses," and a claim from an October 2023 USDA letter (3) that the Heber Wild Horse Herd "is now more than 1,000 animals and shows no signs of stabilization." Ex. A. In response to these FOIA requests, the Forest Service responded that there were "***no*** records responsive" to ISPMB's above requests. **Ex. C** (emphasis added).

71. As an additional example, Plaintiff Betty Nixon issued a FOIA request in April 2025 for all 2024 data on the wild horses in the Apache-Sitgreaves National Forests including but not limited to: (1) the most current copy of the band book with photographs; (2) copies of all ground and aerial surveys with photographs; (3) copies of all reports "related to the Heber Wild Horses, including any accompanying graphs, charts and/or photographs"; (4) copies of all inventories and/or counts of the Heber wild horses. As of filing her objection in October 2025 (five months later), her FOIA request remained unanswered, and remains unanswered to this day.

72. Upon information and belief, the U.S. Forest Service has not made any attempt historically or presently, via census, inventory, or any other type of survey, to determine how many of the horses slated for removal are branded or unbranded.

73. Accordingly, the U.S. Forest Service has made an uninformed determination that these horses that are to be removed (the exact number of which remains unidentified) are feral and not subject to the protections under the Wild Horses and Burros Act of 1971.

74. The U.S. Forest Service has also failed to complete an environmental impact statement ("EIS"), as contemplated by the National Environmental Policy Act ("NEPA"), which would have provided an analysis of the environmental impact this horse removal would have.

75. The U.S. Forest Service is tasked with protecting, managing, and controlling the wild free-roaming horses on the lands of the National Forest System yet, upon

information and belief, they have neglected, for decades, to properly protect, account for, or manage those horses living on the Apache-Sitgreaves National Forest.

76. Without adequate investigation, survey, census and analysis, this federal action risks harming beloved historical symbols of the West, ironically, by the very agency tasked with their protection.

77. Upon information and belief, the Forest Service has now taken the position that the horses in the Apache-Sitgreaves National Forests are not protected wild horses but "unauthorized livestock."

78. On April 10, 2026, the U.S. Forest Service published its "Notice of Intent to Impound Unauthorized Livestock" (the "Notice") in the White Mountain Independent.

79. The Notice provides that (1) "any unbranded livestock … may be impounded without further notice"; (2) "[a]ll impounded animals not redeemed within 5 days … will be offered for sale at public auction"; and (3) "livestock not sold at public sale may be sold at private sale or condemned and destroyed or otherwise disposed of."

80. If the Notice's proposed impoundment or removal is allowed, the family bands in the Heber Herd will be irreparably damaged.

81. If removal is allowed, wild and free-roaming horses will be offered for public sale. Upon information and belief a likely result is that the horses will be sold to locations where slaughter is legal, and they will be killed.

82. Absent the prayed-for declaratory and injunctive relief, Plaintiffs Betty Nixon, ISPMB, and its members will suffer irreparable harm.

## COUNT I

### (VIOLATION OF WILD HORSES AND BURROS ACT OF 1971)

83. The above Paragraphs 1 through 82 are incorporated herein by reference.

84. Evidence exists indicating that, as far back as 1910, wild horses are and have been living in the Apache-Sitgreaves National Forests.

- 13 -

85.	The Wild Free-Roaming Horses and Burros Act of 1971 defines Wild Free-Roaming Horses as "all unbranded and unclaimed horses…on public lands of the United States." 16 U.S.C. § 1332(b).

86.	The unbranded and unclaimed horses on the Apache-Sitgreaves National Forest, including the Black Mesa Ranger District, the Lakeside Ranger District and the Heber Wild Horse Territory satisfy the definition of Wild Free-roaming Horses and are entitled to those protections afforded under the Act.

87.	The preamble and statement of policy for the Wild Free-Roaming Horses and Burros Act of 1971, 16 U.S.C. § 1331, *et seq.*, states:

> Congress finds and declares that wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West; that they contribute to the diversity of life forms within the Nation and enrich the lives of the American people; and that these horses and burros are fast disappearing from the American scene. It is the policy of Congress that wild free-roaming horses and burros shall be protected from capture, branding, harassment, or death, and to accomplish this they are to be considered in the area where presently found, as an integral part of the natural system of the public lands.

88.	The Forest Service violated the Wild Horse and Burro Act by failing to explicitly designate the Heber Herd as "wild free-roaming horses" under 16 U.S.C. § 1332.

89.	The Act defines "wild free-roaming horses and burros" as "all unbranded and unclaimed horses and burros on public lands of the United States." 16 U.S.C. § 1332(b). This designation is a legal status that carries significant management and enforcement consequences.

90.	Under the 1971 Act, the Secretary of Agriculture is "directed to protect and manage wild free-roaming horses and burros as components of the public lands. …" 16 U.S.C. § 1333(a).

91.	The 1971 Act also states that the Secretary "shall manage wild free-roaming horses and burros in a manner that is designated to achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1333(a). The Secretary "shall consider

- 14 -

the recommendations of qualified scientists in the field of biology and ecology, some of whom shall be independent of both Federal and State agencies and may include members of the Advisory Board established in section 1337 of this title." 16 U.S.C. § 1333(a).

92. The Final EA states that horses will be "managed consistent with" the Act, but fails to expressly recognize the animals as wild free-roaming horses, creating evidentiary obstacles for prosecuting illegal killings and leaving the Heber Herd vulnerable to collateral challenges to its status.

93. The Forest Service's April 2026 Letter confirms that the agency is attempting to avoid the requirements of the Wild Free-Roaming Horses and Burros Act by relabeling protected horses as "unauthorized livestock." The agency cannot evade federal statutory protections through post hoc reclassification, particularly where that classification was never analyzed, disclosed, or subjected to public comment.

94. The Forest Service's refusal to make an explicit designation violates the 2007 Stipulated Settlement Agreement, in which the Forest Service expressly recognized that "wild horses are by law an integral part and component of the natural system of the public lands." *See also* 16 U.S.C. § 1331.

95. The Forest Service violated the Act's directive that wild horses be managed "where presently found" by restricting management to arbitrary territorial boundaries that do not reflect the herd's historical and current range. 16 U.S.C. § 1331.

96. While Plaintiffs understand that the Forest Service has not yet contracted with cattle ranchers to place the bait traps and corrals described in Paragraphs 61-62, if the Forest Service does hire these cattle ranchers as contractors, it would be an additional violation of the Act.

97. The Forest Service violated the Act's requirement that "all management activities shall be at the minimal feasible level" by proposing aggressive management strategies including fertility control and population reduction without demonstrating ecological necessity. 16 U.S.C. § 1333(a).

- 15 -

98. The 1971 Act further provides that the Secretary "shall maintain a current inventory of wild free-roaming horses and burros on given areas of the public lands." Section 1333(b).

99. The Forest Service violated the Act's requirement to "maintain a current inventory of wild free-roaming horses and burros on given areas of the public lands" by relying on incomplete and unreliable population data. 16 U.S.C. § 1333(b).

100. The Code of Federal Register ("CFR") 36 Section 222.63 entitled "Removal of Other Horses and Burros," defines the conditions for treating certain horses as "unauthorized livestock" which could then be impounded and disposed of. Section 222.63 provides special protection for horses that do not fall initially within the protection of the 1971 Act, if they are subsequently introduced into a protected territory "by accident, negligence or willful disregard of private ownership" and which become intermingled with wild free-roaming horses.

101. Only if these newly introduced horses do not intermingle may they be considered "unauthorized livestock." Upon information and belief, to the extent there are any domestic horses now living within the wild herds, they have intermingled and under the 1971 Act are entitled to protection as well. Similarly, any newly born foals into the wild are entitled to the protection of the 1971 Act.

102. CFR Section 222.65 of the regulations provides protection for the wild free-roaming horses even if they were to move or migrate off protected territories onto lands of other ownership or jurisdiction.

103. In the Final TMP, the Defendants, including the U.S. Forest Service, made an uninformed and unilateral decision to remove all but 50-104 horses from the Apache-Sitgreaves National Forests as "strays" or "unauthorized livestock." This decision is unsupported by the facts and was made with little to no investigation or inventory of the horses. In so doing, the Defendants have violated the Wild Horses and Burros Act of 1971, including but not limited to:

- 16 -

a. Making the decision to capture and remove horses without first conducting an inventory or accounting of the horses to determine their status as wild or domestic trespass, branded versus unbranded;

b. Making the assumption, without reliable data or investigation to support it, such as input from scientists and biologists, that none of the horses in the Apache-Sitgreaves National Forests and surrounding area which are proposed to be captured and removed are wild free-roaming horses or offspring of those horses;

c. Failing to appoint or consult a joint advisory board concerning this decision to remove horses;

d. Attempting to remove wild free-roaming horses from the Heber Wild Horse Territory and the Apache-Sitgreaves National Forests, including the removal of foals who have been born there;

e. Failing to manage the wild horses in the area;

f. Failing to conduct an inventory or census of the number, types, age, and condition of the wild free-roaming horses in the Apache-Sitgreaves Forests including the Heber Wild Horse Territory; and

g. Failing to hold a public hearing for comment on the decision to use motor vehicles in the capture and transport of these horses.

104. Under the Declaratory Judgment Act, 28 U.S.C. 2201, an actual controversy has arisen between Plaintiff and Defendants involving the interpretation of certain federal statutes and acts within this Court's jurisdiction.

105. Absent a declaration that the Forest Service violated the Wild Horses and Burros Act, ISPMB and its members will suffer immediate and irreparable harm.

- 17 -

<u>**COUNT II**</u>

**(VIOLATION OF NATIONAL ENVIRONMENTAL POLICY ACT)**

106.    The above Paragraphs 1 through 105 are incorporated herein by reference.

107.    The National Environmental Policy Act, or "NEPA", establishes a national policy for the environment through which it seeks to promote, among other things, the preservation of "important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity, and variety of individual choice". 42 U.S.C. § 4331(b)(4).

108.    NEPA provides certain protections for the environment including the requirement that the "responsible official" submit a statement detailing the environmental impact a major federal action will have prior to that action taking place. 42 U.S.C. § 4321, *et seq*.

109.    Specific relevant NEPA requirements include the following:

(2) [A]ll agencies of the Federal Government shall-***

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) reasonably foreseeable environmental effects of the proposed action,

(ii) any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

"Prior to making any detailed statement, the head of the lead agency shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of title 5, and shall accompany the proposal through the existing agency review processes." 42 U.S.C. § 4332.

110. The purpose of requiring an environmental impact statement ("EIS") "is to serve as an action-forcing device by ensuring agencies consider the environmental effects of their action in decision making, so that the policies and goals defined in the Act are infused into the ongoing programs and actions of the Federal Government." They "shall provide full and fair discussion of significant effects and shall inform decision makers and the public of reasonable alternatives that would avoid or minimize adverse effects or enhance the quality of the human environment. Agencies shall focus on important environmental issues and reasonable alternatives . . . ." EISs "shall be concise, clear, and to the point, and shall be supported by evidence that the agency has made the necessary environmental analyses. An environmental impact statement is more than a disclosure document. Federal Agencies shall use environmental impact statements in conjunction with other relevant material to plan actions, involve the public, and make decisions." 40 C.F.R. § 1502.1(c) (2025) (*see also* Para. 112, *infra*).

111. A fundamental part of this protection is the opportunity for public comment, whereby the federal agency "affirmatively solicit[s] comments [from the public] in a manner designed to inform those persons or organizations who may be interested in or affected by the proposed action." 7 C.F.R. Part § 1b.7(d)(2)(iv).

112. The Final EA was "conducted according to the Council on Environmental Quality's 1978 regulations for implementing the procedural provisions of the National Environmental Policy Act (40 CFR §1500-1508, as amended)." Code of Federal

- 19 -

Regulations ("CFR"), Section 1508 defined[2] a Major Federal action, providing that it "means an action that the agency carrying out such action determines is subject to substantial Federal control and responsibility". 40 C.F.R. § 1508(w).

113. Section 1508 provided examples of categories of actions that constitute Major Federal actions, which include, in part, the following:

(3) (ii) Adoption of formal plans, such as official documents prepared or approved by Federal agencies, which prescribe alternative uses of Federal resources, upon which future agency actions will be based.

(iii) Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive.

(iv) Approval of or carrying out specific agency projects, such as construction or management activities.

114. The U.S. Forest Service failed to prepare or issue an Environmental Impact Statement.

115. The U.S. Forest Service relied on a categorical exclusion which it claims exempts it from the EIS requirement to justify its decision to complete the Final EA rather than the required EIS.

116. A categorical exclusion as defined in the Code of Federal Regulations, "means a category of actions that the agency has determined, in its agency NEPA procedures, normally do not have a significant effect on the human environment." 40 C.F.R. § 1508.1(d) (citation omitted). Effect is defined in pertinent part as "changes to the human environment from the proposed action or alternatives that are reasonably foreseeable…[e]ffects include ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, . . . whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental

---

[2] The current version of Title 40 of the CFR does not include these sections.

effects, even if on balance the agency believes that the effects will be beneficial." 40 C.F.R. § 1508.1(i), (i)(4). Finally, "human environment" is defined as "comprehensively the natural and physical environment and the relationship of present and future generations with that environment." 40 C.F.R. § 1508.1(r).

117.    In a December 15, 2021 memo describing its approach to the Heber Herd, the U.S. Forest Service's relied on the categorical exclusion then found at 7 C.F.R. § 1b.3(5)[3] which provides that "[c]ivil and criminal law enforcement and investigative activities" are determined not to have a "significant individual or cumulative effect on the human environment."

118.    The Forest Service's Final TMP involving the capture, removal, and sale of horses living on the Apache-Sitgreaves National Forests constitute far more than just a civil or criminal investigative activity. Those actions, in fact, clearly fit the definition of a Major Federal Action which necessitates compliance with NEPA provisions, including the requirement that an EIS be prepared.

119.    The Final TMP also falls outside the definition of a categorical exclusion. Reliance on this categorical exclusion is nothing but an attempt to remove the horses without engaging in the Environmental Impact Statement due diligence required under the law.

120.    The April 2026 Letter confirms that the agency is not implementing the action it analyzed under NEPA. The Final EA evaluates management of wild horses under federal statutory protections, while the agency is now proceeding by categorizing the horses as "unauthorized livestock." NEPA does not permit an agency to analyze one action and implement another.

121.    The Defendants failed to comply with NEPA by not preparing an EIS before issuing the Final TMP.

---

[3] Section 1b.3(5) was revised, and now-relevant section is 7 CFR § 1b.4(c)(5), which provides that civil and criminal law enforcement and investigative activities constitute a categorical exclusion which does not require NEPA documentation.

SNELL & WILMER

122. Under the Declaratory Judgment Act, 28 U.S.C. 2201, an actual controversy has arisen between Plaintiff and Defendants involving the interpretation of certain federal statutes and acts within this Court's jurisdiction.

123. Absent the prayed-for declaratory relief, Plaintiffs will suffer immediate and irreparable harm.

## COUNT III

## (VIOLATION OF THE ADMINISTRATIVE PROCEDURES ACT)

124. The above Paragraphs 1 through 123 are incorporated herein by reference.

125. The Forest Service's determination of an Appropriate Management Level of 50-104 horses is arbitrary and capricious in violation of the APA, 5 U.S.C. § 706(2)(A).

126. The AML determination relies on a faulty forage model that erroneously assumes wild horses cannot roam beyond the Territory boundaries, contrary to the Act's mandate to protect horses' "free-roaming behavior" and the historical evidence of the Heber Herd's actual range.

127. The AML determination adopts inflated growth projections of 20% annually (based on the WinEquus model) that are contradicted by observed population stability in undisturbed herds, including the Heber Herd's actual growth rate of approximately 3% over the past two decades.

128. The AML of 50-104 horses falls knowingly below the minimum genetic viability threshold of 150-200 horses established in the BLM Handbook H-4700-1, yet the Final EA contains no binding genetics plan to prevent inbreeding depression and genetic collapse.

129. The Forest Service deviated from the BLM Handbook's Tier-2 methodology, which provides that if land health standards are being met, "the appropriate management level is set by considering the number of horses using the area during the evaluation year," without providing any rational explanation for the deviation.

130. As demonstrated by the Forest Service's response to ISPMB's May 2024 FOIA request, *see* Paragraph 68, the Forest Service has failed to support its claims concerning the number of wild horses present in the HWHT.

131. The Forest Service failed to meaningfully respond to ISPMB's prior comments challenging the AML determination, the growth rate assumptions, the genetic viability concerns, and the faulty forage model.

132. The Forest Service refused to evaluate reasonable alternatives raised in public comments, including reducing or retiring livestock grazing allotments within and adjacent to the Territory to increase available forage for wild horses and reduce the environmental impact attributable to livestock grazing (and not to wild horses) in the Territory.

133. The Forest Service's authorization of long-term fertility control measures is arbitrary and capricious because the agency failed to identify specific methods, analyze their documented risks to herd behavior and genetics, ignored evidence that fertility control destabilizes natural band structures, and refused to consider less intrusive alternatives.

134. The Forest Service's failure to address the ongoing illegal killings of more than thirty Heber wild horses since 2018 is arbitrary and capricious because the agency "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983).

<b><u>COUNT IV</u></b>

<b>(VIOLATION OF THE 2007 STIPULATED SETTLEMENT AGREEMENT)</b>

135. The above Paragraphs 1 through 134 are incorporated herein by reference.

136. The 2007 Stipulated Settlement Agreement was adopted by this Court's Federal Court Order dated March 21, 2007.

137. The Forest Service violated the Stipulated Settlement Agreement by failing to work with ISPMB in good faith in the development of the Final TMP.

138. The Forest Service violated the Stipulated Settlement Agreement by failing to meaningfully consider ISPMB's comments on the Draft EA and Final TMP.

139. The Forest Service violated the Stipulated Settlement Agreement by failing to provide ISPMB with specific notice of the Final TMP.

140. The Forest Service violated the Stipulated Settlement Agreement by adopting the Final TMP, which contradicts the agency's prior acknowledgment that "wild horses are, by law, an integral part and component of the natural system of the public lands."

141. The Forest Service violated the Stipulated Settlement Agreement by failing to develop the Final TMP in accordance with the provisions of the Act.

## JURY DEMAND

Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for the following relief:

A. Declare that the Final Territory Management Plan, Final Environmental Assessment, and Finding of No Significant Impact for the Heber Wild Horse Territory violate the Administrative Procedure Act, the Wild Free-Roaming Horses and Burros Act of 1971, and the National Environmental Policy Act;

B. Declare that the Forest Service has violated the 2007 Stipulated Settlement Agreement;

C. Vacate and set aside the Final Territory Management Plan, Final Environmental Assessment, and Finding of No Significant Impact;

D. Enjoin Defendants from implementing any management actions authorized by the Final Territory Management Plan, including gathering, removing, or administering fertility control to the Heber wild horses, or authorizing any private individuals or organizations to gather, remove, or administer fertility control to the Heber Herd, until Defendants comply with all applicable legal requirements;

E. Order Defendants to prepare a full Environmental Impact Statement that rigorously explores and objectively evaluates all reasonable alternatives;

F. Order Defendants to explicitly designate the Heber Herd as "wild free-roaming horses" under 16 U.S.C. § 1332;

G.    Order Defendants to revise the Appropriate Management Level determination using proper methodology and in compliance with genetic viability requirements;

H.    Order Defendants to analyze and address the ongoing illegal killings of Heber wild horses;

I.    Award Plaintiffs their reasonable attorneys' fees, costs, and expenses pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412;

J.    For any other relief the Court or jury deems appropriate.

DATED this 22nd day of April, 2026.

SNELL & WILMER L.L.P.

By: *s/ Amanda Z. Weaver*
    Anthony W. Merrill
    Amanda Z. Weaver
    John Habib
    Sukhmani K. Singh
    One East Washington St., Suite 2700
    Phoenix, Arizona 85004-2556

    *Attorneys for Plaintiffs*

- 25 -

## **VERIFICATION**

I, Karen Sussman, am the President at International Society for the Protection of Mustangs and Burros and am authorized to make this verification for and on Plaintiff International Society for the Protection of Mustangs and Burros' behalf, and I make the verification for that reason. I have read the foregoing **VERIFIED COMPLAINT** and know the contents thereof. The matters and things set forth therein are true to the best of my knowledge, except as to those matters set forth upon information and belief and, as to those, I believe them to be true; however, in compiling this information, information has been supplied by others and I am relying in part upon their representations.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 4/21 April, 2026.

Karen Sussman

- 27 -

4907-3677-1724

4934-6399-2483

**SNELL & WILMER**

## <u>VERIFICATION</u>

I, Betty Nixon, have read the foregoing **VERIFIED COMPLAINT** and know the contents thereof. The matters and things set forth therein are true to the best of my knowledge, except as to those matters set forth upon information and belief and, as to those, I believe them to be true; however, in compiling this information, information has been supplied by others and I am relying in part upon their representations.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 21 April, 2026.



Betty Nixon

- 28 -

4907-3677-1724

4934-6399-2483